## ASSIGNMENT AND ASSUMPTION OF LEASE

This ASSIGNMENT AND ASSUMPTION OF LEASE ("**Assignment**") is made and entered into effective as of June 30, 2014 (the "**Effective Date**"), by and among Ascent Realty, LLC, an Arkansas limited liability company ("**Assignor**"), Ascent, LLC, an Arkansas liability company ("**Assignee**"), and Asset Management Associates, LLC, an Alaska limited liability company ("**Landlord**").

### RECITALS:

A.      Landlord and Assignor have heretofore made and entered into that certain Lease dated June 11, 2014, for the premises (the "**Premises**") consisting of approximately 8,350 square feet of commercial space located at 3607 Oak Lawn Avenue, Dallas, Texas 75219, all as described more particularly in the Lease (the "**Lease**"). A full copy of the Lease is attached as Exhibit A hereto.

B.      Assignor desires to assign all of its right, title and interest in the Lease to Assignee, Assignee desires to accept and assume the same, and Landlord is willing to consent to the proposed Assignment, all on the terms and conditions hereof.

NOW THEREFORE, in consideration of the mutual terms and conditions herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      Assignment.  Assignor hereby TRANSFERS, ASSIGNS, GRANTS AND CONVEYS to Assignee all of Assignor's right, title and interest, in, to and under the Lease, including any security deposit or prepaid rent thereunder.

2.      Acceptance.  Assignee hereby accepts the Assignment granted herein, and assumes and agrees to make all payments and to perform all other obligations of Assignor under the Lease accruing from and after the Effective Date of this Assignment.

3.      Obligations Prior to and Following Effective Date.  All obligations under the Lease arising, accruing or relating to the period before the Effective Date are allocated to Assignor and all obligations arising, accruing or relating to the period thereafter shall be allocated to Assignee.  If the Effective Date occurs other than at the end of any period for which rentals or other charges under the Lease accrue or are due, then such rentals or other charges will be prorated between Assignor and Assignee on a per diem basis.  Any as yet undetermined charges may be reasonably estimated by Landlord in its sole discretion, subject to re-proration between Assignor and Assignee after the actual charges have been determined.

4.      Release and Surrender of Assignor.  Except as is otherwise expressly set forth in this Assignment, Assignor is hereby fully discharged and released by Landlord of and from any and all further obligations under the Lease as of the Effective Date.  Notwithstanding the foregoing, Assignor will remain liable for all indemnities, liabilities and obligations that accrued prior to the Effective Date and all guarantors of the Lease shall remain liable in connection with the Guaranty of Lease entered into in connection with the Lease.

5.      No Release or Further Transfer.

(a)      Continued Liability of Guarantors.  Landlord's consent shall not be deemed in any way or manner to be a waiver or release of Guarantor under that certain Guaranty of Lease dated June 11, 2014 from the responsibility and liability for the payment of rent or other amounts

Assignment and Assumption of Lease – Page 1

10760858v.2 141229/00005

under the Guaranty of Lease and for compliance with any and all obligations to be performed by Tenant as the tenant under the Lease.

        (b)    Prohibition Against Further Transfer.  Assignee shall not, without Landlord's prior written consent in each instance (except as may be otherwise provided in the Lease), (i) convey, assign or encumber the Lease or any interest in the Lease, directly or indirectly, voluntarily or by operation of law, including the merger or conversion of Assignee with or into another entity, (ii) sublet all or any portion of the Premises, or (iii) permit the use or occupancy of any part of the Premises by anyone other than Assignee (any of the foregoing actions shall be a "*Prohibited Transfer*").  Following any Prohibited Transfer, Assignee (and Guarantors) shall remain fully liable under the Lease and this Assignment, as either may be amended with or without notice to or consent of Assignee (or Guarantors), and Landlord may proceed directly under the Lease, the Guaranty of Lease or this Consent against Assignee (or Guarantors) without first proceeding against any other party.

        6.    Landlord's Consent.  Landlord hereby consents to this Assignment and the transaction contemplated hereby and the terms hereof upon the terms and conditions set forth herein.  Unless and until Landlord has executed this Assignment, this Assignment is of no effect, notwithstanding that Landlord may have accepted and may continue to accept rent or the performance of other obligations under the Lease by Assignee.  The consent granted herein should not be construed as consent to any further assignment.  The failure or delay of Landlord in seeking to enforce any provisions of the Lease or this Assignment should not be deemed a waiver of rights or remedies that Landlord may have, or a waiver of any subsequent breach of the terms and provisions therein or herein contained.  Nothing in this Assignment will (a) enlarge or increase Landlord's obligations or liability or (b) reduce or decrease Landlord's rights, under the Lease or otherwise.

        7.    Notices.  Any notice given by any party to another party hereto must be given in the manner required under the Lease.  The addresses set forth below supercede any addresses for notices set forth in the Lease.

             If to Assignee:    c/o Larkin Group
                            6750 W. Loop S., Suite 950
                            Bellaire, Texas 77401
                            Attn: Greg McGaw

             If to Assignor:    c/o Larkin Group
                            6750 W. Loop S., Suite 950
                            Bellaire, Texas 77401
                            Attn: Greg McGaw

        8.    Successors.  Except as herein otherwise provided, this Assignment will be binding upon and inure to the benefit of the parties hereto, and their respective heirs, executors, administrators, successors and assigns.

        9.    Indemnification by Assignee.  Assignee hereby agrees to indemnify, protect, defend and hold harmless Assignor from and against any and all claims, losses and damages, including without limitation, reasonable attorneys' fees and costs, arising from and after the Effective Date of this Assignment that may at any time be asserted against Assignor by (i) Landlord for failure of Assignee to perform any of the covenants, agreements, terms, provisions or conditions contained in the Lease, which Assignee is obligated to perform by reason of the provisions of this Assignment, or

Assignment and Assumption of Lease – Page 2

10760858v.2 141229/00005

AMA000032

(ii) any person by reason of Assignee's use and/or occupancy of the Premises. This Section shall survive the expiration or earlier termination of the Lease and/or this Assignment.

10.     Indemnification by Assignor. Assignor hereby agrees to indemnify, protect, defend and hold harmless Assignee from and against any and all claims, losses and damages, including without limitation, reasonable attorneys' fees and costs, arising prior to the Effective Date of this Assignment that may at any time be asserted against Assignee by (i) Landlord for failure of Assignor to perform any of the covenants, agreements, terms, provisions or conditions contained in the Lease, or (ii) any person by reason of Assignor's use and/or occupancy of the Premises. This Section shall survive the expiration or earlier termination of the Lease and/or this Assignment.

11.     Counterparts. This Assignment may be executed in multiple counterparts, each of which, once executed, will be an original and fully-binding on the parties so executing; and all such counterparts together constitute one and the same agreement.

12.     Severability. If any term or provision of this Assignment or the application thereof to any person or circumstances shall, to any extent, be invalid and unenforceable, then the remainder of this Assignment or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term or provision of this Assignment shall be valid and be enforced to the fullest extent permitted by law.

13.     Further Assurances. Assignor and Assignee, at any time after the Effective Date, will promptly execute, acknowledge and deliver any further documents and instruments of transfer, reasonably requested by the other party and necessary to comply with the representations, warranties and covenants contained herein and will take any action consistent with the terms of this Assignment that may reasonably be requested by the other party to accomplish the purposes of and the transactions contemplated by this Agreement and the documents executed in connection therewith.

14.     Binding Offer. This Assignment will not be binding on any party hereto until executed and delivered by all three parties herein named.

*[signature page immediately follows]*

Assignment and Assumption of Lease – Page 3

10760858v.2 141229/00005

IN WITNESS WHEREOF, the parties have executed this Assignment as of the date first above written.

**ASSIGNOR**:

ASCENT REALTY, LLC,
an Arkansas limited liability company

By: _____
Name: _____
Its: _____ manager _____

**ASSIGNEE**:

ASCENT          ., LLC,
an Arkansas limited liability company

By: _____
Name: _____
Its: _____ manager _____

Landlord hereby executes below to acknowledge its consent to the foregoing Assignment.

**LANDLORD**:

ASSET MANAGEMENT ASSOCIATES, LLC,
an Alaska limited liability company

By: _____
Name: _____
Its: _____

Assignment and Assumption of Lease – Signature Page

1076085 8v.2 141229/00005

AMA000034

## CONSENT OF GUARANTORS

In connection with that certain Guaranty of Lease (the "*Guaranty*") attached to the Lease, the undersigned consent to the terms and conditions of this Assignment and acknowledge and agree that (i) such Guaranty remains in full force and effect, and the undersigned hereby ratify and confirm their liability and obligations thereunder, (ii) the execution of this Assignment shall in no way diminish the liability of the undersigned under such Guaranty, nor impair or affect the enforceability thereof against such undersigned parties, and (iii) the liability and obligations of the undersigned shall extend to and include the liability and obligations under the Lease and this Assignment.

GUARANTORS:

Cole Peck, M.D.
1001 CR 759
Jonesboro, AR  72401

Ja Lynn Kuo, M.D.
2014 W Colonial
Orlando, FL  32804

Karen Kuo, M.D.
1001 CR 759
Jonesboro, AR  72401

Subho Mullick, M.D.
225 S. Main, Apt. 204
Jonesboro, AR  72401

James Fletcher, III
2905 Abernathy
Jonesboro, AR  72404

Salima Thobani
6945 Alta Vista
Rancho Palos Verdes, CA  90275

Gary Mark Wilson
4901 S 27th St
Paragould, AR  72450

Assignment and Assumption of Lease – Signature Page

10760858v.2 141229/00005

AMA000035

## CONSENT OF GUARANTORS

In connection with that certain Guaranty of Lease (the "*Guaranty*") attached to the Lease, the undersigned consent to the terms and conditions of this Assignment and acknowledge and agree that (i) such Guaranty remains in full force and effect, and the undersigned hereby ratify and confirm their liability and obligations thereunder, (ii) the execution of this Assignment shall in no way diminish the liability of the undersigned under such Guaranty, nor impair or affect the enforceability thereof against such undersigned parties, and (iii) the liability and obligations of the undersigned shall extend to and include the liability and obligations under the Lease and this Assignment.

**GUARANTORS:**

Cole Peck, M.D.
1001 CR 759
Jonesboro, AR  72401

Ja Lynn Kuo, M.D.
2014 W Colonial
Orlando, FL  32804

Karen Kuo, M.D.
1001 CR 759
Jonesboro, AR  72401

Subho Mullick, M.D.
225 S. Main, Apt. 204
Jonesboro, AR  72401

James Fletcher, III
2905 Abernathy
Jonesboro, AR  72404

Salima Thobani
6945 Alta Vista
Rancho Palos Verdes, CA  90275

Gary Mark Wilson
4901 S 27th St

<ins>Assignment and Assumption of Lease</ins> – Signature Page

10760858v.2 141229/00005

AMA000036

Landlord hereby executes below to acknowledge its consent to the foregoing Assignment.

**LANDLORD**:

ASSET MANAGEMENT ASSOCIATES, LLC,

an Alaska limited liability company

By:

Name:

Its:

**CONSENT OF GUARANTORS**

In connection with that certain Guaranty of Lease (the *"Guaranty"*) attached to the Lease, the undersigned consent to the terms and conditions of this Assignment and acknowledge and agree that (i) such Guaranty remains in full force and effect, and the undersigned hereby ratify and confirm their liability and obligations thereunder, (ii) the execution of this Assignment shall in no way diminish the liability of the undersigned under such Guaranty, nor impair or affect the enforceability thereof against such undersigned parties, and (iii) the liability and obligations of the undersigned shall extend to and include the liability and obligations under the Lease and this Assignment.

**GUARANTORS:**

Cole Peck, M.D.
1001 CR 759
Jonesboro, AR  72401

Ja Lynn Kuo, M.D.
2014 W Colonial
Orlando, FL  32804

Karen Kuo, M.D.
1001 CR 759
Jonesboro, AR  72401

Subho Mullick, M.D.

## CONSENT OF GUARANTORS

In connection with that certain Guaranty of Lease (the "*Guaranty*") attached to the Lease, the undersigned consent to the terms and conditions of this Assignment and acknowledge and agree that (i) such Guaranty remains in full force and effect, and the undersigned hereby ratify and confirm their liability and obligations thereunder, (ii) the execution of this Assignment shall in no way diminish the liability of the undersigned under such Guaranty, nor impair or affect the enforceability thereof against such undersigned parties, and (iii) the liability and obligations of the undersigned shall extend to and include the liability and obligations under the Lease and this Assignment.

**GUARANTORS:**

Cole Peck, M.D.
1001 CR 759
Jonesboro, AR  72401

Ja Lynn Kuo, M.D.
2014 W Colonial
Orlando, FL  32804

Karen Kuo, M.D.
1001 CR 759
Jonesboro, AR  72401

Subho Mullick, M.D.
225 S. Main, Apt. 204
Jonesboro, AR  72401

James Fletcher, III
2905 Abernathy
Jonesboro, AR  72404

Salima Thobani
6945 Alta Vista
Rancho Palos Verdes, CA  90275

Gary Mark Wilson
4901 S 27th St
Paragould, AR  72450

AMA000038

Greg McGaw
6750 W. Loop S., Suite 950
Bellaire, TX 77401

David Shoulders
17400 N. Dallas Pkwy, Suite 100
Dallas, Texas 75287

Assignment and Assumption of Lease – Signature Page

10760858v.2 141229/00005

AMA000039

Greg McGaw
6750 W. Loop S., Suite 950
Bellaire, TX 77401


David Shoulders
17400 N. Dallas Pkwy, Suite 100
Dallas, Texas 75287

Assignment and Assumption of Lease – Signature Page

10760858v.2 141229/00005

AMA000040

## EXHIBIT A

### Lease

*(see attached)*

AMA000041

**LEASE**

**BETWEEN**

**ASSET MANAGEMENT ASSOCIATES, LLC**

**("LANDLORD")**

**AND**

**ASCENT REALTY, LLC**

**("TENANT")**

9984871v.6 141229/00005

AMA000042

## LEASE

This Lease (this "*Lease*") is entered into by and between ASSET MANAGEMENT ASSOCIATES, LLC, an Alaska limited liability company ("*Landlord*"), and ASCENT REALTY, LLC, an Arkansas limited liability company ("*Tenant*"), and shall be effective as of the date set forth below Landlord's signature (the "*Effective Date*")

1.   **Basic Lease Information**.  The key business terms used in this Lease are defined as follows:

A.  "*Building*":  The building located at 3607 Oak Lawn Avenue, Dallas, Texas 75219.

B.  "*Square Footage of the Building*" is 17,548 square feet.

C.  "*Premises*":  Approximately 8,350 square feet located on the 1st floor of the Building, as depicted on **Exhibit A-1** to this Lease.  The "*Square Footage of the Premises*" is approximately 8,350 square feet.

D.  "*Base Rent*":

| Period | | | Annual Rate Per Square Foot | Monthly Base Rent |
|---|---|---|---|---|
| Lease Month 1 | – | Lease Month 60 | $35.00 | $24,354.17 |
| Lease Month 61 | – | Lease Month 120 | $40.00 | $27,833.33 |

**Notwithstanding the foregoing, but subject to Section 4.I below and provided that no event of default has occurred under this Lease beyond the expiration of any applicable cure period, Base Rent for Lease Month 1 shall be abated.**

E.  "*Tenant's Pro Rata Share*":  The percentage equal to the Square Footage of the Premises divided by the Square Footage of the Building.

F.  "*Term*":  The period of one hundred twenty (120) Lease Months starting on the Commencement Date, subject to the provisions of **Article 3**.  The first "*Lease Month*" shall commence on the Commencement Date and end on the last day of the first full calendar month occurring after the Commencement Date (i.e., the calendar month in which the Commencement Date occurs if the Commencement Date is the first day of a calendar month and otherwise the period between the Commencement Date and the last day of the first full calendar month following the calendar month in which the Commencement Date occurs).  Each other Lease Month shall be each successive calendar month.  The first "*Lease Year*" shall consist of Lease Months 1 through 12 and each other Lease Year shall be each successive twelve Lease Month period (provided that the final Lease Year shall run through and include the Expiration Date).

G.  "*Commencement Date*":  One hundred fifty (150) days after the Effective Date. Tenant shall promptly apply for a building permit for the space upon execution of this Lease.  If, through no fault or delay by Tenant, Tenant is unable to obtain a building permit from the

AMA000043

applicable governmental authority on or before the forty-fifth (45th) day after the Effective Date, the Commencement Date shall be extended to the earlier of (i) two hundred ten (210) days after the Effective Date or (ii) the date on which Tenant opens for business in the Premises.

**H.** *"Security Deposit"*: $32,669.38

**I.** *"Prepaid Rent"*: $29,190.21. Tenant will pay Landlord on the date this Lease is executed by Tenant the Prepaid Rent, which amount shall be applied to Tenant's Base Rent and Additional Rent obligation for Lease Month 2.

**J.** *"Guarantors"*: Cole Peck, M.D.; Ja_Lynn Kuo, M.D., Karen Kuo, M.D., Subho Mullick, M.D., James Fletcher, III, Salima Thobani, and Gary Mark Wilson, jointly and severally, subject to the terms of the Guaranty of Lease attached hereto and incorporated herein.

**K.** *"Business Day(s)"*: Monday through Friday of each week, exclusive of New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving and Christmas Day (*"Holidays"*).

**L.** *"Law(s)"*: All applicable statutes, codes, ordinances, orders, rules and regulations of any municipal or governmental entity, now or hereafter adopted, including the Americans with Disabilities Act and any other law pertaining to disabilities and architectural barriers (collectively, *"ADA"*), and all laws pertaining to the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §9601 et seq. (*"CERCLA"*), and all restrictive covenants existing of record and all rules and requirements of any existing association or improvement district affecting the Property.

**M.** *"Normal Business Hours"*: 7:00 A.M. to 6:00 P.M. on Business Days and 8:00 A.M. to 3:00 P.M. on Saturdays, exclusive of Holidays, unless otherwise amended by written notice from Tenant to Landlord, in Tenant's reasonable discretion.

**N.** *"Permitted Use"*: Freestanding emergency room clinic, and related ancillary office use.

**O.** *"Tenant's Trade Name"*: PhysiciansER.

**P.** *"Percentage Rent Rate"*: Not applicable.

**Q.** *"Gross Sales Breakpoint"*: Not applicable.

**R.** *"Tenant's Broker"*: The Retail Connection c/o Mitch Traub.

**S.** *"Notice Addresses"*:

AMA000044

*Tenant*:  On or after the Commencement Date, notices shall be sent to Tenant at the Premises. Prior to the Commencement Date, notices shall be sent to Tenant at the following address:

*With a copy to:*

| | |
|---|---|
| c/o The Larkin Group | Blue Rhodes, PLLC |
| 6750 W. Loop S., Suite 950 | 812 San Antonio Street, Suite 310 |
| Bellaire, Texas  77401 | Austin, Texas  78701 |
| Attn:  Greg McGaw | Attn:  Michael Blue |
| Phone #:  (713) 838-0800 | Phone #:  (512) 501-6378 |
| | Fax #:  (512) 501-6378 |

| *Landlord:* | *With a copy to:* | *And to:* |
|---|---|---|
| Asset Management | Berlin Interests, Inc. | Jackson Walker L.L.P. |
| Associates, LLC | 3906 Lemmon Avenue, | 901 Main Street |
| 745 Fort Street, | Suite 100 | Suite 6000 |
| Suite 1410 | Dallas, Texas 75219 | Dallas, Texas 75202 |
| Honolulu, Hawaii 96813 | Attn: Ronald P. Berlin | Attn: Judge A. Platt |
| Attn: Herbert Lee, Jr. | Phone #: (214) 526-6564 | Phone #: (214) 953-5639 |
| Phone #: (808) 536-6137 | Fax #: (214) 692-6655 | Fax #: (214) 661-6639 |
| Fax #: (808) 536-6143 | | |

Rent (defined in **Section 4.A**) is payable to the order of Asset Management Associates, LLC at the following address: 745 Fort Street, Suite 1410, Honolulu, Hawaii  96813.

2.      **Lease Grant**.  Landlord leases the Premises to Tenant and Tenant leases the Premises from Landlord, together with the right in common with others to use any portions of the Property (defined below) that are designated by Landlord for the common use of tenants and others, such as sidewalks, common corridors, vending areas, lobby areas and, with respect to multi-tenant floors, restrooms and elevator foyers (the "***Common Areas***").  "***Property***" means the Building and the parcel(s) of land on which it is located as more fully described on **Exhibit A-2**, together with all other buildings and improvements located thereon; all appurtenances including all appurtenant parking facilities; and other improvements serving the Building, if any, and the parcel(s) of land on which they are located.  The Square Footage of the Building and/or the Square Footage of the Premises shall be subject to measurement from time to time by Landlord's architect at Landlord's option and at Landlord's sole cost and expense.

3.      **Term; Adjustment of Commencement Date; Early Access**.

        A.      **Term**.  This Lease shall govern the relationship between Landlord and Tenant with respect to the Premises from the Effective Date through the last day of the Term specified in **Section 1.F** (the "***Expiration Date***"), unless terminated early in accordance with this Lease.  The Term of this Lease shall commence on the Commencement Date.  If Landlord is delayed in delivering possession of the Premises or any other space due to any reason, including the holdover or unlawful possession of such space by any third party, or for any other reason, such delay shall not be a default by Landlord, render this Lease void or voidable, or otherwise render Landlord liable for damages.  Promptly after the Commencement Date, Landlord shall prepare and deliver to Tenant a commencement letter agreement substantially in the form attached as **Exhibit C**.  If such commencement letter is not executed by Tenant within 15 days after delivery of same by Landlord, then Tenant shall be deemed to have agreed with the matters set forth

AMA000045

therein.  Notwithstanding any other provision of this Lease to the contrary, if the Expiration Date would otherwise occur on a date other than the last day of a calendar month, then the Term shall be automatically extended to include the last day of such calendar month, which shall become the Expiration Date.

   **B.  Acceptance of Premises**.  The Premises are accepted by Tenant in "as is" condition and configuration.  **TENANT HEREBY AGREES THAT THE PREMISES ARE IN GOOD ORDER AND SATISFACTORY CONDITION AND THAT, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS LEASE, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, BY LANDLORD REGARDING THE PREMISES, THE BUILDING OR THE PROPERTY.**

   **C.  Early Access**.  Landlord hereby grants early access to the Premises as of the Effective Date for the purpose of performing improvements or installing furniture, equipment or other personal property. During such time that Tenant is accessing the Premises for the purpose of performing improvements or installing furniture, equipment or other personal property, Tenant shall not be required to pay Base Rent or additional Rent for the Premises for any days of such early access; provided however, Tenant shall pay for the cost of any other Building services requested by Tenant. Landlord hereby consents to Tenant's occupancy of the Premises for the purposes of conducting business therefrom prior to the Commencement Date and Tenant shall not be required to pay Base Rent or additional Rent for any days of such early occupancy; provided however, Tenant shall pay for all utility services costs associated with such early occupancy which shall be due and payable by Tenant on or before 30 days after billing by Landlord. Early access to or early occupancy of the Premises shall be subject to the terms and conditions of the Lease.

4.  **Rent**.

   **A.  Payments**.  As consideration for this Lease, commencing on the Commencement

AMA000046

of any rights such party may have under this Lease or applicable Law.  Tenant's covenant to pay Rent is independent of every other covenant in this Lease.

**B. Additional Rent**.  In addition to all other sums due under this Lease, Tenant shall pay Tenant's Pro Rata Share of the CAM Costs, Tax Expenses and Insurance Expenses (collectively, the "*Additional Rent*") for each calendar year during the Term.  On or about January 1 of each calendar year, Landlord shall provide Tenant with a good faith estimate of the Additional Rent for such calendar year during the Term.  On or before the first day of each month, Tenant shall pay to Landlord a monthly installment equal to one-twelfth of Landlord's estimate of the Additional Rent.  If Landlord determines that its good faith estimate of the Additional Rent was incorrect, Landlord may provide Tenant with a revised estimate.  After its receipt of the revised estimate, Tenant's monthly payments shall be based upon the revised estimate.  If Landlord does not provide Tenant with an estimate of the Additional Rent by January 1 of a calendar year, Tenant shall continue to pay monthly installments based on the most recent estimate(s) until Landlord provides Tenant with the new estimate.  Upon delivery of the new estimate, an adjustment shall be made for any month for which Tenant paid monthly installments based on the same year's prior incorrect estimate(s).  Tenant shall pay Landlord the amount of any underpayment within 30 days after receipt of notice of the amount of underpayment.  Any overpayment shall be credited against the next sums due and owing by Tenant or, if no further Rent is due, refunded directly to Tenant within 30 days of determination.  The obligation of Tenant to pay for Additional Rent as provided herein shall survive the expiration or earlier termination of this Lease.

**C. Reconciliation of Additional Rent**.  Within 120 days after the end of each calendar year or as soon thereafter as is practicable, Landlord shall furnish Tenant with a statement of the actual Additional Rent for such calendar year.  If the most recent estimated Additional Rent paid by Tenant for such calendar year is more than the actual Additional Rent for such calendar year, Landlord shall apply any overpayment by Tenant against Rent due or next becoming due; provided, if the Term expires before the determination of the overpayment, Landlord shall, within 30 days of determination, refund any overpayment to Tenant after first deducting the amount of Rent due.  If the most recent estimated Additional Rent paid by Tenant for the prior calendar year is less than the actual Additional Rent for such year, Tenant shall pay Landlord, within 30 days after its receipt of notice of the amount of underpayment, any underpayment for the prior calendar year.

**D. Audit Rights**.  Within 60 days after Landlord furnishes its statement of actual CAM Costs for any calendar year (the "*Audit Election Period*"), Tenant may, at its expense, elect to audit Landlord's CAM Costs for such calendar year only, subject to the following conditions:  (1) there is no uncured event of default under this Lease; (2) the audit shall be prepared by an independent certified public accounting firm of recognized national standing; (3) in no event shall any audit be performed by a firm retained on a "contingency fee" basis; (4) the audit shall commence within 60 days after Landlord makes Landlord's books and records available to Tenant's auditor and shall conclude within 60 days after commencement; (5) the audit shall be conducted during Landlord's normal business hours at the location where Landlord maintains its books and records and shall not unreasonably

AMA000047

interfere with the conduct of Landlord's business; (6) Tenant and its accounting firm shall treat any audit in a confidential manner and shall each execute Landlord's confidentiality agreement for Landlord's benefit prior to commencing the audit; and (7) the accounting firm's audit report shall, at no charge to Landlord, be submitted in draft form for Landlord's review and comment before the final approved audit report is delivered to Landlord, and any reasonable comments by Landlord shall be incorporated into the final audit report. This paragraph shall not be construed to limit, suspend, or abate Tenant's obligation to pay Rent when due, including estimated CAM Costs. Landlord shall credit any overpayment determined by the final approved audit report against the next Rent due and owing by Tenant or, if no further Rent is due, refund such overpayment directly to Tenant within 30 days of determination. Likewise, Tenant shall pay Landlord any underpayment determined by the final approved audit report within 30 days of determination. The foregoing obligations shall survive the expiration or termination of this Lease. If Tenant does not give written notice of its election to audit Landlord's CAM Costs during the Audit Election Period, Landlord's CAM Costs for the applicable calendar year shall be deemed approved for all purposes, and Tenant shall have no further right to review or contest the same.

**E. Common Area Maintenance Costs**. Tenant shall pay Tenant's Pro Rata Share of all costs and expenses incurred or accrued in each calendar year in connection with the ownership, operation, maintenance, management, repair and protection of the Property, including Landlord's personal property used in connection with the Property (collectively, ***"CAM Costs"***). CAM Costs include all commercially reasonable (to the extent such costs are within Landlord's control) costs and expenditures relating to the following:

1. Operation, maintenance, repair and replacements of any part of the Common Areas, including (to the extent applicable) any landscape sprinkler systems; materials and supplies; equipment and tools; painting; seasonal holiday decorations; upkeep and seasonal replacement of landscaping; maintenance, repair and replacement of sidewalks and parking areas; interior and exterior signage; personal property; required or beneficial easements; related service agreements and rental expenses; any and all forms of fuel or energy utilized in connection with the operation, maintenance and use of the Building which are not individually metered and paid for by the tenants of the Building, sales, use, excise and other taxes assessed by governmental authorities on energy services supplied to the Building and other costs of providing energy services to the Building; and energy management consulting services.

2. Administrative costs and management fees, including accounting, information and professional services (except for negotiations and disputes with specific tenants not affecting other parties); and wages, salaries and taxes (or allocations thereof) for full and part time personnel involved in operation, maintenance and management.

3. Compliance with Laws, including license, permit and inspection fees (but not in duplication of capital expenditures amortized as provided in **Section 4.D(5)**); and all expenses and fees, including reasonable attorneys' fees and court or other venue of dispute resolution costs, incurred in negotiating or contesting real estate taxes or the validity and/or applicability of any governmental enactments which may affect CAM Costs; provided Landlord

AMA000048

shall credit against CAM Costs any refunds received from such negotiations or contests to the extent originally included in CAM Costs (less Landlord's costs).

4.   Goods and services purchased from Landlord's subsidiaries and Affiliates to the extent the cost of same is generally consistent with rates charged by unaffiliated third parties for similar goods and services.

5.   Amortization of capital expenditures incurred: (a) to conform with Laws enacted or amended after the date of this Lease; (b) to provide or maintain building standards (other than building standard tenant improvements); or (c) with the intention of promoting safety or reducing or controlling increases in CAM Costs, such as lighting retrofit and installation of energy management systems.  Such expenditures shall be amortized uniformly over the following periods of time (together with interest on the unamortized balance at the Prime Rate (as hereinafter defined) as of the date incurred plus 2%):  for building improvements, the shorter of 10 years or the estimated useful life of the improvement; and for all other items, 5 years for expenditures under $50,000 and 7 years for expenditures in excess of $50,000.  Notwithstanding the foregoing, Landlord may elect to amortize capital expenditures under this subsection over a longer period of time based upon (i) the purpose and nature of the expenditure, (ii) the relative capital burden on the Property, (iii) for cost savings projects, the anticipated payback period, and (iv) otherwise in accordance with sound real estate accounting principles consistently applied.

F.   **Exclusions to CAM Costs.**  CAM Costs exclude the following expenditures:

1.   Leasing commissions, attorneys' fees and other expenses related to leasing tenant space and constructing improvements for the sole benefit of an individual tenant.

2.   Goods and services furnished to an individual tenant of the Building which are above building standard and which are separately reimbursable directly to Landlord in addition to CAM Costs.

3.   Repairs, replacements and general maintenance paid by insurance proceeds or condemnation proceeds.

4.   Except as provided in **Section 4.E(5)**, depreciation, amortization, interest payments on any encumbrances on the Building and the cost of capital improvements or additions.

5.   Expenses for repairs or maintenance related to the Property which have been reimbursed to Landlord pursuant to warranties or service contracts.

6.   Principal payments on indebtedness secured by liens against the Property, or costs of refinancing such indebtedness.

7.   Tax Expenses.

8.   Expenses related to promotional funds or merchant association membership.

AMA000049

**G. Tax Expenses.** Tenant shall pay Tenant's Pro Rata Share of all real estate taxes, assessments, excises, association dues, fees, levies, charges and other taxes of every kind and nature whatsoever, general and special, extraordinary and ordinary, foreseen and unforeseen, including interest on installment payments, which may be levied or assessed against or arise in connection with ownership, use, occupancy, rental, leasing, operation or possession of the Property, or paid as rent under any ground lease ("***Tax Expenses***").  Tax Expenses shall include, without limitation: (i) any tax on the rent or other revenue from the Property, or any portion thereof, or as against the business of owning or leasing the Property, or any portion thereof, including any business, franchise, gross margins, or similar tax payable by Landlord which is attributable to rent or other revenue derived from the Property, (ii) any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the Rent payable hereunder, (iii) personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the Property, (iv) any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises, and (v) any assessment, tax, fee, levy or charge substituted, in whole or in part, for a tax previously in existence, or assessed in lieu of a tax increase.  Tax Expenses shall not include Landlord's estate, excise, income taxes (except to the extent provided above) or any fees, interest or other expenses assessed to or incurred by Landlord as a penalty.

**H. Insurance Expenses.**  Tenant shall pay Tenant's Pro Rata Share of all costs incurred in connection with property, liability and other insurance coverages carried by Landlord in connection with the Building ("***Insurance Expenses***"), including deductibles and risk retention programs and a proportionate allocation of the cost of blanket insurance policies maintained by Landlord and/or its Affiliates.  The term "***Affiliate***" means any person or entity controlling, controlled by or under common control with Tenant or Landlord, as applicable.

**I. Intentionally Omitted.**

**J. Abated Rent.**  The term "**Abated Rent**" as used herein shall mean the sum of all Base Rent for Lease Month 1.  Tenant shall be credited with having paid all of the Abated Rent on the expiration of the Term only if Tenant has fully and timely performed all of Tenant's material obligations under this Lease, including the payment of all Rent (other than the Abated Rent).  Tenant acknowledges that its right to receive credit for the Abated Rent is conditioned upon Tenant's full and timely performance of its material obligations under this Lease.  Tenant shall only be deemed to have not fully and timely performed all of its material obligations under this Lease if Tenant should fail to fully and timely perform any of its material obligations under this Lease beyond the expiration of any applicable cure period, and as a result thereof a default shall occur.  If Tenant fails to fully and timely perform all of its material obligations under this Lease, the Abated Rent shall immediately become due and payable in full and this Lease shall be enforced as if there were no such Base Rent abatement.

5. **Tenant's Use of Premises.**

**A. Permitted Use**.  The Premises shall be used for the Permitted Use and for no other uses or purposes.  Without in any way expanding the foregoing, Tenant shall not use or permit the use of the Premises for any purpose which is illegal, creates obnoxious odors, noises or vibrations, is dangerous to persons or property, could increase Landlord's insurance costs, or which, in Landlord's reasonable opinion, unreasonably disturbs any other tenants of the Building or interferes with the operation or maintenance of the Property. Furthermore, Tenant shall not conduct its business on the Premises in a manner or any purpose which, in the reasonable opinion of the Landlord, harms or tends to harm the business or reputation of the Landlord or Property or reflects unfavorably on the Property, or any part of the Property, or deceives or defrauds the public; or conduct or advertise on or from or pertaining to the Premises any auction or going out of business sale.  Tenant shall keep the Premises in a neat, clean and sanitary condition at all times.  Landlord and Tenant acknowledge that the Building is a "smoke free" facility and that no form of tobacco smoke shall be permitted at any time in any portion of the Premises without prior written approval of Landlord and Tenant.  Tenant shall conduct business in the Premises exclusively under the trade name set forth in **Section 1** of this Lease unless otherwise agreed in writing by Landlord.

**B. Compliance with Laws**.  Tenant shall comply with all Laws regarding the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises and the use of the Common Areas.  Tenant, within 10 days after receipt, shall provide Landlord with copies of any notices Tenant receives regarding a violation or alleged or potential violation of any Laws.  Tenant shall comply with the rules and regulations of the Building attached as **Exhibit B** and such other reasonable rules and regulations (or modifications thereto) adopted by Landlord from time to time; provided that such rules and regulations are applied in an equitable manner as reasonably determined by Landlord. Tenant shall also use good faith efforts to inform and instruct its agents, contractors, subcontractors, employees, customers, and subtenants to comply with all rules and regulations.

**C. Tenant's Security Responsibilities**.  Tenant shall (1) lock the doors to the Premises and take other reasonable steps to secure the Premises and the personal property of all Tenant Parties (as hereinafter defined) and any of Tenant's transferees, contractors or licensees in the Common Areas and parking facilities of the Building and Property, from unlawful intrusion, theft, fire and other hazards; (2) keep and maintain in good working order all security and safety devices installed in the Premises by or for the benefit of Tenant (such as locks, smoke detectors and burglar alarms); and (3) cooperate with Landlord and other tenants in the Building on Building safety matters.  Tenant acknowledges that any security or safety measures employed by Landlord are for the protection of Landlord's own interests; that Landlord is not a guarantor of the security or safety of the Tenant Parties or their property; and that such security and safety matters are the responsibility of Tenant and the local law enforcement authorities.

**D. Tenant's Covenants**.  Tenant shall (1) at Tenant's expense, cause the Premises to be treated for termites, rodents, and other pests and vermin as often as Landlord reasonably considers necessary, but, in no event, less frequently than semi-annually, and comply with

AMA000051

any reasonable general extermination program that may be established by Landlord; (2) keep any display windows or signs in or attached to the Premises well lit during such times as any Common Areas abutting the Premises is lit by Landlord or as otherwise required by Landlord, and at Tenant's expense, comply with any reasonable window cleaning program that may be established by Landlord; (3) not permit odors to emanate from either grease traps or a trash handling room or any other area within the Premises, and, upon verbal request from the property manager, promptly take steps to abate any odor arising therefrom; (4) not advertise any distress, fire, bankruptcy, liquidation, relocation, closing or going out of business sale unless such representations are true and Tenant has obtained Landlord's prior written consent; (5) not warehouse or stock within the Premises any goods, wares or merchandise other than those Tenant intends to use for the Permitted Use; (6) not use or permit the use on the Premises of any pinball machines, newspaper racks, or pay telephones, and (7) at Tenant's expense, provide regular janitorial services to the Premises.

     **E. Continuous Operation**.  Tenant acknowledges that its continuous occupancy of the Premises and the regular uninterrupted conduct of its business for the Permitted Use therein are of utmost importance to Landlord in the renting of space in the Building, the renewal of other leases therein, and in the character and quality of the other tenants in the Building.  Tenant therefore agrees to conduct its business for the Permitted Use in the entire Premises and to be open to the general public on the Commencement Date of this Lease and to continuously be open to the general public and operate its business during all Normal Business Hours during the term of this Lease, subject only to temporary closures of reasonable duration necessitated by force majeure.  The foregoing shall not be deemed to preclude Tenant from operating at other times (i.e., in addition to the Normal Business Hours).

     **F. Decorating and Signs**.  Tenant shall erect and maintain such signs, awnings and canopies as required and previously approved by Landlord in writing.  Tenant shall insure and maintain any sign, awning or canopy in good condition, repair and operating order at all times.  If Tenant's sign is damaged or inoperative, Tenant shall commence to repair such sign within 10 days after receipt of written notice from Landlord.  Landlord, at Landlord's option, may repair such sign at Tenant's expense upon the failure of Tenant to commence such repairs timely.  Tenant shall not place or maintain any decoration, lettering, or advertising matter, on the glass of any window or door of the Premises without Landlord's prior written consent.  All signs, decorations, displays or advertising of Tenant visible from the exterior of the Premises shall be permitted only to the extent approved by Landlord in writing.

     **G. Waste and Refuse Collection**.  Tenant shall be responsible for arranging and paying for services for collection and disposal of waste, including, without limitation, and rental or purchase prices paid for dumpsters, which dumpster shall be located in the area on or near the existing loading dock as designated by Landlord and agreed upon by Tenant for such purpose (the "***Refuse Area***").  Tenant shall be allowed to locate up to two (2) 2-yard garbage receptacles in the Refuse Area.

AMA000052

**H. Parking**.  Tenant's customers, agents and invitees shall be entitled to park their

AMA000053

subcontractors, employees, customers, and subtenants to comply with all rules and regulations.

   **J.  Tenant's Security Responsibilities**.  Tenant shall (1) lock the doors to the Premises and take other reasonable steps to secure the Premises and the personal property of all Tenant Parties (defined in **Article 12**) and any of Tenant's transferees, contractors or licensees in the Common Areas and parking facilities of the Building and Property, from unlawful intrusion, theft, fire and other hazards; (2) keep and maintain in good working order all security and safety devices installed in the Premises by or for the benefit of Tenant (such as locks, smoke detectors and burglar alarms); and (3) cooperate with Landlord and other tenants in the Building on Building safety matters.  Tenant acknowledges that any security or safety measures employed by Landlord are for the protection of Landlord's own interests; that Landlord is not a guarantor of the security or safety of the Tenant Parties or their property; and that such security and safety matters are the responsibility of Tenant and the local law enforcement authorities.

6.  **Security Deposit**.  The Security Deposit shall be delivered to Landlord upon the execution of this Lease by Tenant and shall be held by Landlord (without liability for interest, except to the extent required by Law) as security for the performance of Tenant's obligations under this Lease.  The Security Deposit is not an advance payment of Rent or a measure of Tenant's liability for damages.  Landlord may, from time to time while an event of default remains uncured, without prejudice to any other remedy, use all or a portion of the Security Deposit to satisfy past due Rent, cure any uncured default by Tenant, or repay Landlord for damages and charges for which Tenant is legally liable under this Lease or resulting from Tenant's breach of this Lease.  If Landlord uses the Security Deposit, Tenant shall upon 10 days written notice restore the Security Deposit to its original amount and such use by Landlord of the Security Deposit shall not constitute a cure of the existing event of default until such time as the entire amount owing to Landlord is paid in full and the Security Deposit is fully restored.  Provided that Tenant has performed all of its obligations hereunder, Landlord shall return any unapplied portion of the Security Deposit to Tenant within 30 days after the later to occur of: (A) the date Tenant surrenders possession of the Premises to Landlord in accordance with this Lease; or (B) the Expiration Date.  Tenant does hereby authorize Landlord to withhold from the Security Deposit all amounts allowed by Law and the amount reasonably anticipated by Landlord to be owed by Tenant as a result of an underpayment of Tenant's Pro Rata Share of any Additional Rent or other charges for the final year of the Term.  To the fullest extent permitted by applicable Law, Tenant agrees that the provisions of this **Article 6** shall supersede and replace all statutory rights of Tenant under applicable Law regarding the retention, application or return of security deposits.  If Landlord transfers its interest in the Premises, Landlord shall assign the Security Deposit to the transferee and, following the assignment and the delivery to Tenant of an acknowledgement of the transferee's responsibility for the Security Deposit if required by Law, Landlord shall have no further liability for the return of the Security Deposit.  Landlord shall not be required to keep the Security Deposit separate from its other accounts.

7.  **Services**.

---

AMA000054

A. **Obtaining Service**.  The term "*Utilities*" means all of the following services and all taxes and other charges thereon:  (1) electricity, gas, steam, and other power, water and sewer; (2) television cable, Internet, telephone and other picture, voice and data transmission and reception; (3) fire protection sprinklers; (4) burglar, fire, smoke and other alarms; (5) garbage and trash removal; and (6) heat, ventilating and air conditioning.  Tenant shall (i) apply in Tenant's own name and obtain all Utilities required for Tenant's business, (ii) comply with all Utility company regulations, including requirements for the installation of meters, (iii) pay all deposits, connection, tap and meter fees, and all monthly and other charges for obtaining and using Utilities, (iv) install and connect all equipment and lines required to supply the Utilities to the extent not already available at or serving the Premises or, at Landlord's option, repair, alter or replace existing equipment and lines, and (v) not install or use any equipment or fixtures in the Premises which would exceed the design capacity of any Utility equipment or lines serving the Premises.  Landlord may furnish one or more Utilities to Tenant, and in such event Tenant shall purchase such Utility or Utilities from Landlord, and shall pay as additional Rent the reasonable rates established for such services by Landlord.   Notwithstanding anything foregoing to the contrary, Landlord shall be responsible for the cost of separately metering any Utilities to the Premises if deemed necessary or desirable by Landlord.

B. **Service Interruptions**.  No failure or interruption of any Utility (a "*Service Failure*"), whether or not the service was provided by Landlord, shall render Landlord liable to Tenant, constitute an event of default by Landlord under this Lease, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, or relieve Tenant from the obligation to fulfill any covenant or agreement.  In no event shall Landlord be liable to Tenant for any loss or damage, including the theft of Tenant's Property (as hereinafter defined), arising out of or in connection with any Service Failure or the failure of any Building safety services, personnel or equipment.  Tenant waives all Claims against the Landlord Parties arising from Service Failures.  Notwithstanding the foregoing, commencing on the 6th consecutive Business Day of a Service Failure which is beyond the control of Landlord (unless the Service Failure is caused by a fire or other casualty, in which event **Section 16** controls), Tenant shall, as its sole remedy, be entitled to an equitable diminution of Base Rent based upon the pro rata portion of the Premises which is rendered unfit for occupancy for the Permitted Use, except to the extent such Service Failure is caused by a Tenant Party.

C. **Third Party Services**.  If Tenant desires any service which Landlord has not specifically agreed to provide in this Lease, such as private security systems or telecommunications services serving the Premises, Tenant shall procure such service directly from a reputable third party service provider ("*Provider*") for Tenant's own account.  Tenant shall use good faith efforts to instruct and inform each Provider to comply with the Building's rules and regulations, all Laws, and Landlord's reasonable policies and practices for the Building.  Tenant acknowledges Landlord's current policy that requires all Providers utilizing any area of the Property outside the Premises to be approved by Landlord and to enter into a written agreement acceptable to Landlord prior to gaining access to, or making any installations in or through, such area.  Accordingly, Tenant shall give Landlord written notice sufficient for such purposes, but in no event less than 14 days' prior written notice.

AMA000055

8. **Intentionally Omitted**.

9. **Repairs and Alterations**.

      **A. Tenant's Repair Obligations**.  Tenant shall keep the Premises in good condition and repair, ordinary wear and tear excepted.  Tenant's repair obligations include, without limitation, repairs to:  (1) floor covering and/or raised flooring; (2) interior partitions; (3) doors; (4) the interior side of demising walls; (5) electronic, phone, data and other cabling and related equipment (collectively, "*Cable*") that is installed by or for the benefit of Tenant whether located in the Premises or in other portions of the Building; (6) all Utility lines and related facilities serving the Premises, including air conditioning units, kitchens, including hot water heaters, plumbing, dishwashers, ice machines and similar facilities; (7) all leasehold improvements in the Premises; (8) plate glass (including regularly scheduled interior and exterior window washing); (9) all of Tenant's furnishings, Trade Fixtures (as defined below), equipment and inventory; and (10) all of Tenant's storefront, signs, awnings and canopies.  Tenant shall also keep all Common Areas immediately adjoining the Premises free from trash, litter and obstructions.  Prior to performing any such repair obligation, Tenant shall give written notice to Landlord describing the necessary maintenance or repair.  Within 5 Business Days after receipt of such notice, Landlord may elect either to perform any of the maintenance or repair obligations specified in such notice, or require that Tenant perform such obligations by using contractors approved by Landlord.  All work shall be performed at Tenant's expense in accordance with the rules and procedures described in **Section 9.C** below.  If Tenant fails to make any repairs to the Premises for more than 15 days after notice from Landlord (although notice shall not be required if there is an emergency), Landlord may, in addition to any other remedy available to Landlord, make the repairs, and Tenant shall pay to Landlord the reasonable cost of the repairs within 30 days after receipt of an invoice, together with an administrative charge in an amount equal to 10% of the cost of the repairs.  As used herein, "*Trade Fixtures*" means any and all signs placed or installed by Tenant within or upon the Premises pursuant to the provisions of this Lease and any and all items of property used by Tenant in the Premises (whether or not affixed to the Premises by (a) screws, bolts, glue, tape, or other fastener of any kind or character, or (b) specially designed, built-in, or incorporated into any other item of property), including but not limited to furniture, equipment, and appliances provided, however, that Trade Fixtures shall not include any permanent leasehold improvements, including but not limited to any floor, wall or ceiling coverings, any interior wall or partitions, any lighting fixtures, track lights or any property constitutes a component part, any electrical, plumbing, or mechanical system, notwithstanding that the same may have been installed within the Premises.

      **B. Landlord's Repair Obligations**.  Landlord shall keep and maintain in good repair and working order and make repairs to and perform maintenance upon:  (1) Common Areas; and (2) the roof, foundation, load bearing components, and exterior surface of the Building (excluding doors, plate glass and display and other windows).  If any of the foregoing maintenance or repair is necessitated due to the acts or omissions of any Tenant Party (as hereinafter defined), Tenant shall pay the costs of such repairs or maintenance to Landlord within 30 days after receipt of an itemized invoice, together with an administrative

AMA000056

charge in an amount equal to 10% of the cost of the repairs. Landlord shall ensure that all HVAC and plumbing systems serving the Premises are in good working order on the Effective Date.

**C. Alterations.**

(1) *When Consent Is Required*.  Tenant shall not make alterations, additions or improvements to the Premises or install any Cable in the Premises or other portions of the Building (collectively, "*Alterations*") without first obtaining the written consent of Landlord in each instance, which may not be unreasonably withheld or delayed.  However, Landlord's consent shall not be required for any Alteration that satisfies all of the following criteria (a "*Minor Alteration*"):  (a) is of a cosmetic nature such as painting, wallpapering, hanging pictures and installing carpeting; (b) is not visible from outside the Premises or Building; (c) will not affect the systems or structure of the Building; and (d) does not require work to be performed inside the walls or above the ceiling of the Premises.

(2) *Requirements For All Alterations, Including Minor Alterations*.  Prior to starting work on any Alteration (other than Minor Alterations), Tenant shall furnish to Landlord for review and approval, which approval may not be unreasonably withheld or delayed: plans and specifications; names of proposed contractors (provided that Landlord may designate specific contractors with respect to Building systems); copies of contracts; necessary permits and approvals; evidence of contractors' and subcontractors' insurance; and Tenant's security for performance of the Alteration.  Changes to the plans and specifications must also be submitted to Landlord for its approval, which may not be unreasonably withheld or delayed.  Some of the foregoing requirements may be waived by Landlord for the performance of specific Alterations; provided that such waiver is obtained in writing prior to the commencement of such Alterations.  Landlord's waiver on one occasion shall not waive Landlord's right to enforce such requirements on any other occasion.  Alterations shall be constructed in a good and workmanlike manner using materials of a quality that is at least equal to the quality designated by Landlord as the minimum standard for the Building.  Landlord may designate reasonable rules, regulations and procedures for the performance of Alterations in the Building and, to the extent reasonably necessary to avoid disruption to the occupants of the Building, shall have the right to designate the time when Alterations may be performed.  Tenant shall reimburse Landlord within 30 days after receipt of an invoice for reasonable out-of-pocket sums paid by Landlord for third party examination of Tenant's plans for Alterations.  In addition, within 30 days after receipt of an invoice from Landlord, Tenant shall pay to Landlord a fee equal to 10% of the total cost of such Alterations, for Landlord's oversight and coordination of any Alterations.  No later than 30 days after completion of the Alterations, Tenant shall furnish "as-built" plans (which shall not be required for Minor Alterations), completion affidavits, full and final waivers of liens, receipts and bills covering all labor and materials.  Tenant shall assure that the Alterations comply with all insurance requirements and Laws.

(3) *Landlord's Liability For Alterations*.  Landlord's approval of an Alteration shall not be a representation by Landlord that the Alteration complies with applicable Laws or will be adequate for Tenant's use.  Tenant acknowledges that Landlord is not an architect

AMA000057

or engineer, and that the Alterations will be designed and/or constructed using independent architects, engineers and contractors.  Accordingly, Landlord does not guarantee or warrant that the applicable construction documents will comply with Laws or be free from errors or omissions, or that the Alterations will be free from defects, and Landlord will have no liability therefor.

10. **Entry by Landlord**.  Landlord, its agents, contractors and representatives may enter the Premises to inspect or show the Premises, to clean and make repairs, alterations or additions to the Premises, and to conduct or facilitate repairs, alterations or additions to any portion of the Building, including other tenants' premises.  Except in emergencies or to provide any Building services after Tenant's operating hours, Landlord shall provide Tenant with reasonable prior notice of entry into the Premises, which may be given orally.  Landlord shall have the right to temporarily close all or a portion of the Premises to perform repairs, alterations and additions, if reasonably necessary for the protection and safety of Tenant and its employees.  Except in emergencies, Landlord will not close the Premises if the work can reasonably be completed after Tenant's operating hours; provided, however, that Landlord is not required to conduct work after Tenant's operating hours if such work can be conducted without closing the Premises.  Entry by Landlord for any such purposes shall not constitute a constructive eviction or entitle Tenant to an abatement or reduction of Rent.

11. **Assignment and Subletting**.

      **A.**  **Landlord's Consent Required**.  Subject to the remaining provisions of this

AMA000059

of Tenant from any of its obligations or liabilities under this Lease. Tenant shall pay Landlord's actual reasonable costs and expenses (including reasonable attorney's fees) for Landlord's review of any proposed Transfer, but in no case shall such fee exceed $2,500.00.

   **C.  Payment to Landlord**. If the aggregate consideration paid to a Tenant Party for a Transfer exceeds that payable by Tenant under this Lease (prorated according to the transferred interest), Tenant shall pay Landlord 50% of such excess (after deducting therefrom reasonable leasing commissions and reasonable costs of tenant improvements paid to unaffiliated third parties in connection with the Transfer, with proof of same provided to Landlord). Tenant shall pay Landlord for Landlord's share of any excess within 30 days after Tenant's receipt of such excess consideration. If any uncured event of default exists under this Lease (or a condition exists which, with the passage of time or giving of notice, would become an event of default), Landlord may require that all sublease payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of any payments received, but not to exceed the amount payable by Tenant under this Lease.

   **D.  Change in Control of Tenant**. If Tenant is a corporation, limited liability company, partnership, or similar entity, and if the entity which owns or controls a majority of the voting shares/rights in Tenant at any time sells or disposes of such majority of voting shares/rights, or changes its identity for any reason (including a merger, consolidation or reorganization), such change of ownership or control shall constitute a Transfer. The foregoing shall not apply so long as, both before and after the Transfer, Tenant is an entity whose outstanding stock is listed on a recognized U.S. securities exchange, or if at least 80% of its voting stock is owned by another entity, the voting stock of which is so listed; provided, however, that Tenant shall give Landlord written notice at least 30 days prior to the effective date of such change in ownership or control.

12. **Liens**. Tenant shall take commercially reasonable measures to ensure that no mechanic's or other liens are placed upon the Property, Premises or Tenant's leasehold interest in connection with any work or service done or purportedly done by or for the benefit of Tenant. If a lien is so placed, Tenant shall, within 10 days of written notice from Landlord of the filing of the lien, fully discharge the lien by settling the claim which resulted in the lien or by bonding or insuring over the lien in the manner prescribed by the applicable lien Law. If Tenant fails to discharge the lien or commence and diligently pursue actions to dispute the lien , then, in addition to any other right or remedy of Landlord, Landlord may bond or insure over the lien or otherwise discharge the lien. Tenant shall, within 30 days after receipt of an invoice from Landlord, reimburse Landlord for any amount paid by Landlord, including reasonable attorneys' fees, to bond or insure over the lien or discharge the lien.

13. **Indemnity**. Subject to **Article 15** Tenant shall hold Landlord, its trustees, Affiliates, subsidiaries, members, principals, beneficiaries, partners, officers, directors, shareholders, employees, Mortgagee(s) (defined in **Article 25**) and agents (including the manager of the Property) (collectively, "*Landlord Parties*") harmless from, and indemnify and defend such parties against, all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including reasonable attorneys' fees and other professional fees that may be imposed

AMA000060

upon, incurred by or asserted against any of such indemnified parties (each a "*Claim*" and collectively "*Claims*") that arise out of or in connection with any damage or injury occurring in the Premises to the extent, and only to the extent, that the same is not the result of any breach or nonperformance of this Lease by Landlord or from any grossly negligent act or omission or intentional misconduct of Landlord's agents, employees, family or licensees.  Provided Landlord Parties are properly named as additional insureds in the policies required to be carried under this Lease, and except as otherwise expressly provided in this Lease, the indemnity set forth in the preceding sentence shall be limited to the greater of (A) $3,000,000, and (B) the aggregate amount of general/umbrella liability insurance actually carried by Tenant.  Subject to **Articles 9.B**, **15** and **20**, Landlord shall hold Tenant, its trustees, members, principals, beneficiaries, partners, officers, directors, shareholders, employees and agents (collectively, "*Tenant Parties*" and individually, a "*Tenant Party*") harmless from, and indemnify and defend such parties against, all Claims that arise out of or in connection with any damage or injury occurring in or on the Property (excluding the Premises, unless the same is the result of any breach of this Lease by Landlord or from any grossly negligent act or omission or intentional misconduct of Landlord Parties), to the same extent the Tenant Parties would have been covered had they been named as additional insureds on the commercial general liability insurance policy required to be carried by Landlord under this Lease.  The indemnity set forth in the preceding sentence shall be limited to the amount of $3,000,000.

14. **Insurance**.

     A. **Tenant's Insurance**.  Tenant shall maintain the following insurance ("*Tenant's Insurance*"), at its sole cost and expense:  (1) commercial general liability insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a per occurrence limit of no less than $1,000,000; (2) causes of loss-special form (formerly "all risk") property insurance, including flood and earthquake, covering all above building standard leasehold improvements and Tenant's trade fixtures, equipment, furniture and other personal property within the Premises ("*Tenant's Property*") in the amount of the full replacement cost thereof as reasonably estimated by Tenant; (3) business income (formerly "business interruption") insurance written on an actual loss sustained form or with sufficient limits to address reasonably anticipated business interruption losses; (4) business automobile liability insurance to cover all owned, hired and non-owned automobiles owned or operated by Tenant providing a minimum combined single limit of $1,000,000; (5) workers' compensation insurance as required by the state in which the Premises is located and in amounts as may be required by applicable statute; (6) employer's liability insurance in an amount of at least $500,000 per occurrence; and (7) umbrella liability insurance that follows form in excess of the limits specified in (1), (4) and (6) above, of no less than $3,000,000 per occurrence and in the aggregate.  Any company underwriting any of Tenant's Insurance shall have, according to *A.M. Best Insurance Guide*, a Best's rating of not less than A- and a Financial Size Category of not less than VIII.  All commercial general liability, business automobile liability and umbrella liability insurance policies shall name Landlord (or any successor), Landlord's property manager, Landlord's Mortgagee (if any), and their respective members, principals, beneficiaries, partners, officers, directors, employees, and agents, and other designees of Landlord as the interest of such designees shall appear, as "additional insureds" and shall be primary with Landlord's policy being secondary and

AMA000061

noncontributory.  If any aggregate limit is reduced because of losses paid to below 75% of the limit required by this Lease, Tenant will notify Landlord in writing within 10 days of the date of notice of such reduction.   All policies of Tenant's Insurance shall contain endorsements that the insurer(s) shall give Landlord and its designees at least 30 days' advance written notice of any change, cancellation, termination or lapse of insurance. Tenant shall provide Landlord with a certificate of insurance and all required endorsements evidencing Tenant's Insurance prior to the earlier to occur of the Commencement Date or the date Tenant is provided access to the Premises for any reason, and upon renewals at least 10 days prior to the expiration of the insurance coverage.  All of Tenant's Insurance policies, endorsements and certificates will be on forms and with deductibles and self-insured retention, if any, reasonably acceptable to Landlord.  The limits of Tenant's insurance shall not limit Tenant's liability under this Lease.

      **B.  Landlord's Insurance**.  Landlord shall maintain:   (1) commercial general liability insurance applicable to the Property which provides, on an occurrence basis, a minimum combined single limit of no less than $5,000,000 (coverage in excess of $1,000,000 may be provided by way of an umbrella/excess liability policy); and (2) causes of loss-special form (formerly "all risk") property insurance on the Building in the amount of the replacement cost thereof, as reasonably estimated by Landlord.  The foregoing insurance and any other insurance carried by Landlord may be effected by a policy or policies of blanket insurance and shall be for the sole benefit of Landlord and under Landlord's sole control.  Consequently, Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

15. **Mutual Waiver of Subrogation**.  Notwithstanding anything in this Lease to the contrary, Tenant waives, and shall cause its insurance carrier(s) and any other party claiming through or under such carrier(s), by way of subrogation or otherwise, to waive any and all rights of recovery, Claim, action or causes of action against all Landlord Parties for any loss or damage to Tenant's business, any loss of use of the Premises, and any loss, theft or damage to Tenant's Property (including Tenant's automobiles or the contents thereof), including all rights (by way of subrogation or otherwise) of recovery, Claims, actions or causes of action arising out of the negligence of any Landlord Party, which loss or damage is (or would have been, had the insurance required by this Lease been maintained) covered by insurance.  In addition, Landlord shall cause its insurance carrier(s) and any other party claiming through or under such carrier(s), by way of subrogation or otherwise, to waive any and all rights of recovery, Claim, action or causes of action against all Tenant Parties for any loss of or damage to or loss of use of the Building, any additions or improvements to the Building, or any contents thereof, **including all rights (by way of subrogation or otherwise) of recovery, Claims, actions or causes of action arising out of the negligence of any Tenant Party,** which loss or damage is (or would have been, had the insurance required by this Lease been maintained) covered by insurance.

16. **Casualty Damage**.

      **A.  Repair or Termination by Landlord**.   If all or any part of the Premises are damaged by fire or other casualty, Tenant shall immediately notify Landlord in writing. Landlord shall have the right to terminate this Lease if:  (1) the Building shall be damaged so

---

AMA000062

that, in Landlord's judgment, substantial alteration or reconstruction of the Building shall be required (whether or not the Premises have been damaged); (2) Landlord is not permitted by Law to rebuild the Building in substantially the same form as existed before the fire or casualty; (3) the Premises have been materially damaged and there is less than 2 years of the Term remaining on the date of the casualty; (4) any Mortgagee requires that the insurance proceeds be applied to the payment of the mortgage debt; or (5) an uninsured loss of the Building occurs notwithstanding Landlord's compliance with **Section 14.B** above.  Landlord may exercise its right to terminate this Lease by notifying Tenant in writing within 90 days after the date of the casualty.  If Landlord does not terminate this Lease under this **Section 16.A**, Landlord shall commence and proceed with reasonable diligence to repair and restore the Building and/or the Premises to substantially the same condition as existed immediately prior to the date of damage; provided, however, that Landlord shall only be required to reconstruct building standard leasehold improvements existing in the Premises as of the date of damage, and Tenant shall be required to pay the cost for restoring any other leasehold improvements.  However, in no event shall Landlord be required to spend more than the insurance proceeds received by Landlord.

> **B.  Timing for Repair; Termination by Either Party**.  If all or any portion of the Premises is damaged as a result of fire or other casualty, Landlord shall, with reasonable promptness, cause an architect or general contractor selected by Landlord to provide Landlord and Tenant with a written estimate of the amount of time required to substantially complete the repair and restoration of the Premises, using standard working methods ("*Completion Estimate*").  If the Completion Estimate indicates that the Premises cannot be made tenantable within 180 days from the date of damage, then regardless of anything in **Section 16.A** above to the contrary, either party shall have the right to terminate this Lease by giving written notice to the other of such election within 10 days after receipt of the Completion Estimate.  Tenant, however, shall not have the right to terminate this Lease if the fire or casualty was caused by the negligence or intentional misconduct of any of the Tenant Parties.  If neither party terminates this Lease under this **Section 16.B**, then Landlord shall repair and restore the Premises in accordance with, and subject to the limitations of, **Section 16.A**.

> **C.  Abatement**.  In the event a material portion of the Premises is damaged such that Tenant cannot reasonably use the Premises for the Permitted Use as a result of a fire or other casualty, the Base Rent shall abate until substantial completion of the repairs and restoration required to be made by Landlord pursuant to **Section 16.A**.  Tenant, however, shall not be entitled to such abatement if the fire or other casualty was caused by the negligence or intentional misconduct of any of the Tenant Parties.  Landlord shall not be liable for any loss or damage to Tenant's Property or to the business of Tenant resulting in any way from the fire or other casualty or from the repair and restoration of the damage.  Landlord and Tenant hereby waive the provisions of any Law relating to the matters addressed in this Article, and agree that their respective rights for damage to or destruction of the Premises shall be those specifically provided in this Lease.

17. **Condemnation**.  Either party may terminate this Lease if the whole or any material part of the Premises or Common Area are taken or condemned for any public or quasi-public use under

AMA000063

Law, by eminent domain or private purchase in lieu thereof (a "*Taking*").  Landlord shall also have the right to terminate this Lease if there is a Taking of any portion of the Building or Property which would leave the remainder of the Building unsuitable for use in a manner comparable to the Building's use immediately prior to the Taking.  In order to exercise its right to terminate this Lease under this **Article 17**, Landlord or Tenant, as the case may be, must provide written notice of termination to the other within 30 days after the terminating party first receives notice of the Taking.  Any such termination shall be effective as of the date the physical taking of the Premises or the portion of the Building or Property occurs.  If this Lease is not terminated, the Square Footage of the Building, the Square Footage of the Premises and Tenant's Pro Rata Share shall, if applicable, be appropriately adjusted by Landlord.  In addition, Base Rent for any portion of the Premises taken or condemned shall be abated during the unexpired Term effective when the physical taking of the portion of the Premises occurs.  All compensation awarded for a Taking, or sale proceeds, shall be the property of Landlord, any right to receive compensation or proceeds being expressly waived by Tenant.  However, Tenant may file a separate claim at its sole cost and expense for Tenant's Property (excluding above building standard leasehold improvements) and Tenant's reasonable relocation expenses, provided the filing of such claim does not diminish the award which would otherwise be receivable by Landlord.

18. **Events of Default**.  Tenant shall be considered to be in default under this Lease upon the occurrence of any of the following events of default:

> **A.** Tenant's failure to pay when due all or any portion of the Rent and such failure continues uncured for a period of 7 days following written notice thereof ("*Monetary Default*"); provided, however, that Tenant shall only be entitled to receive such notice two (2) times within any twelve (12) month period, and any subsequent failure to pay Rent during such twelve (12) month period shall not require any such notice from Landlord.

> **B.** Tenant's failure to perform any of the obligations of Tenant in the manner set forth in **Section 5.E.** or **Articles 14** (and such failure continues uncured for a period of 3 days following Landlord's delivery of written notice thereof), **24** or **25** (a "*Time Sensitive Default*").

> **C.** Tenant's failure (other than a Monetary Default or a Time Sensitive Default) to comply with any term, provision or covenant of this Lease, if the failure is not cured within 10 days after written notice to Tenant.  However, if Tenant's failure to comply cannot reasonably be cured within 10 days, Tenant shall be allowed additional time as is reasonably necessary to cure the failure so long as:  (1) Tenant commences to cure the failure within the 10 day period following Landlord's initial written notice, and (2) Tenant diligently pursues a course of action that will cure the failure and bring Tenant back into compliance with this Lease.  However, if Tenant's failure to comply creates a hazardous condition, the failure must be cured immediately upon notice to Tenant.  In addition, if Landlord provides Tenant with notice of Tenant's failure to comply with the same specific term, provision or covenant of this Lease on more than two (2) occasions during any 12 month period, Tenant's subsequent violation of the same term, provision or covenant shall, at Landlord's option, be deemed an incurable event of default by Tenant.

AMA000064

**D.** Tenant or any Guarantor files a petition for protection under the U.S. Bankruptcy Code (or similar Law) or a petition is filed against Tenant or any Guarantor under such Laws and is not dismissed within 45 days after the date of such filing, makes a transfer in fraud of creditors or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts when due.

**E.** The leasehold estate is taken by process or operation of Law.

**F.** Tenant does not take possession of, or abandons or vacates all or a substantial portion of the Premises.

**G.** Tenant is in default beyond any notice and cure period under any other lease or agreement with Landlord, including any lease or agreement for parking.

19. **Remedies.**

**A. Landlord's Remedies.** Upon any default, Landlord shall have the right without notice or demand (except as provided in **Article 18**) to pursue any of its rights and remedies at Law or in equity, including any one or more of the following remedies:

(1) Terminate this Lease;

(2) Re-enter the Premises, change locks, alter security devices and lock out Tenant or terminate Tenant's right of possession of the Premises without terminating this Lease, and without complying with applicable Law, the benefits of which are waived by Tenant to the fullest extent permitted by applicable Law;

(3) Remove and store, at Tenant's expense, all the property in the Premises using such lawful force as may be necessary;

(4) Cure such event of default for Tenant at Tenant's expense (plus a 10% administrative fee);

(5) Withhold or suspend payment of sums Landlord would otherwise be obligated to pay to Tenant under this Lease or any other agreement;

(6) Require all future payments to be made by cashier's check, money order or wire transfer after the first time any check is returned for insufficient funds, or the second time any sum due hereunder is more than five (5) days late;

(7) Apply any Security Deposit as permitted under this Lease; and/or

(8) Recover such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable Law, including any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of events would be likely to result therefrom.

AMA000065

**B.  Measure of Damages**.

(1) *Calculation*.  If Landlord either terminates this Lease or terminates Tenant's right to possession of the Premises, Tenant shall immediately surrender and vacate the Premises and pay Landlord on demand:  (a) all Rent accrued through the end of the month in which the termination becomes effective; (b) interest on all unpaid Rent from the date due at a rate equal to the lesser of 18% per annum or the highest interest rate permitted by applicable Law; (c) all expenses reasonably incurred by Landlord in enforcing its rights and remedies under this Lease, including all reasonable legal expenses; (d) Costs of Reletting (defined below); and (e) all Landlord's Rental Damages (defined below).  In the event that Landlord relets the Premises for an amount greater than the Rent due during the Term, Tenant shall not receive a credit for any such excess.

(2) *Definitions*.  "***Costs of Reletting***" shall include commercially reasonable costs,

AMA000066

liabilities under this Lease, nor be entitled to any damages hereunder, based upon minor or immaterial errors in the exercise of Landlord's remedies.  No right or remedy of Landlord shall be exclusive of any other right or remedy.  Each right and remedy shall be cumulative and in addition to any other right and remedy now or subsequently available to Landlord at Law or in equity.  If Tenant fails to pay any amount when due hereunder (after the expiration of any applicable cure period), Landlord shall be entitled to receive interest on any unpaid item of Rent from the date initially due (without regard to any applicable grace period) at a rate equal to the lesser of 18% per annum or the highest rate permitted by Law.  In addition, if Tenant fails to pay any item or installment of Rent when due (after the expiration of any applicable cure period), Tenant shall pay Landlord an administrative fee equal to $750.00. However, in no event shall the charges permitted under this **Section 19.C** or elsewhere in this Lease, to the extent they are considered interest under applicable Law, exceed the maximum lawful rate of interest.  If any payment by Tenant of an amount deemed to be interest results in Tenant having paid any interest in excess of that permitted by Law, then it is the express intent of Landlord and Tenant that all such excess amounts theretofore collected by Landlord be credited against the other amounts owing by Tenant under this Lease.  Receipt by Landlord of Tenant's keys to the Premises shall not constitute an acceptance or surrender of the Premises.  **Notwithstanding any other provision of this Lease to the contrary, Tenant shall hold Landlord Parties harmless from and indemnify and defend such parties against, all Claims that arise out of or in connection with Tenant's breach of this Lease, specifically including any violation of applicable Laws or Contamination (defined in Article 30) caused by a Tenant Party.**

     **D.  Mitigation of Damages**.  Upon termination of Tenant's right to possess the Premises, Landlord shall, only to the extent required by Law, use objectively reasonable efforts to mitigate damages by reletting the Premises.  Landlord shall not be deemed to have failed to do so if Landlord refuses to lease the Premises to a prospective new tenant with respect to whom Landlord would be entitled to withhold its consent pursuant to **Section 11.A**, or who (1) is an Affiliate, parent or subsidiary of Tenant; (2) is not acceptable to any Mortgagee of Landlord; (3) requires improvements to the Premises to be made at Landlord's expense; or (4) is unwilling to accept lease terms then proposed by Landlord, including:  (a) leasing for a shorter or longer term than remains under this Lease; (b) re-configuring or combining the Premises with other space, (c) taking all or only a part of the Premises; and/or (d) changing the use of the Premises.  Notwithstanding Landlord's duty to mitigate its damages as provided herein, Landlord shall not be obligated (i) to give any priority to reletting Tenant's space in connection with its leasing of space in the Building or any complex of which the Building is a part, or (ii) to accept below market rental rates for the Premises or any rate that would negatively impact the market rates for the Building.  To the extent that Landlord is required by applicable Law to mitigate damages, Tenant must plead and prove by clear and convincing evidence that Landlord failed to so mitigate in accordance with the provisions of this **Section 19.D**, and that such failure resulted in an avoidable and quantifiable detriment to Tenant.

     **E.  Waiver of Landlord's Lien**.  Landlord hereby waives and disclaims all statutory and contractual lien rights in Tenant's personal property located within the Premises or the

AMA000067

Building (but not any fixtures within the Premises or Building that have become a part of the real property).

20. **Limitation of Liability**.  Notwithstanding anything to the contrary contained in this Lease, the liability of Landlord (and of any successor Landlord) to Tenant (or any person or entity claiming by, through or under Tenant) shall be limited to the interest of Landlord in the Property. Tenant shall look solely to Landlord's interest in the Property for the recovery of any judgment or award against Landlord.  No Landlord Party shall be personally liable for any judgment or deficiency.  Before filing suit for an alleged default by Landlord, Tenant shall give Landlord and the Mortgagee(s) (defined in **Article 25**) whom Tenant has been notified hold Mortgages (defined in **Article 25**) on the Property, Building or Premises, notice and reasonable time to cure the alleged default.   Tenant hereby waives all claims against all Landlord Parties for consequential, special or punitive damages allegedly suffered by any Tenant Parties, including lost profits and business interruption.

21. **No Waiver**.  Neither party's failure to declare a default immediately upon its occurrence or delay in taking action for a default shall constitute a waiver of the default, nor shall it constitute an estoppel.  Neither party's failure to enforce its rights for a default shall constitute a waiver of that party's rights regarding any subsequent default.

22. **Tenant's Right to Possession**.  Provided Tenant pays the Rent and fully performs all of its other covenants and agreements under this Lease, Tenant shall have the right to occupy the Premises without hindrance from Landlord or any person lawfully claiming through Landlord, subject to the terms of this Lease, all Mortgages, insurance requirements and applicable Law. This covenant and all other covenants of Landlord shall be binding upon Landlord and its successors only during its or their respective periods of ownership of the Building, and shall not be a personal covenant of any Landlord Parties.

23. **Intentionally Deleted**.

24. **Holding Over**.  Except for any permitted occupancy by Tenant under **Article 29**, if Tenant or any party claiming by, through or under Tenant fails to surrender the Premises at the expiration or earlier termination of this Lease, the continued occupancy of the Premises shall be that of a tenancy at sufferance.  Tenant shall pay an amount (on a per month basis without reduction for partial months during the holdover) equal to 150% of the sum of the Base Rent and Additional Rent due for the period immediately preceding the holdover; provided, however, such amount shall not be less than the then-current fair market gross rental for the Premises.  Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease.   No holdover by Tenant or payment by Tenant after the expiration or early termination of this Lease shall be construed to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise.  In addition to the payment of the amounts provided above, if Landlord is unable to deliver possession of the Premises to a new tenant, or to perform improvements for a new tenant as a result of Tenant's holdover, and Tenant fails to vacate the Premises within 15 days after Landlord notifies Tenant of Landlord's inability to deliver possession, or perform improvements, such failure shall constitute a Time Sensitive Default hereunder; and notwithstanding any other provision of this Lease to the contrary, TENANT SHALL BE LIABLE TO LANDLORD FOR, AND SHALL PROTECT LANDLORD FROM AND

AMA000068

**INDEMNIFY AND DEFEND LANDLORD AGAINST, ALL LOSSES AND DAMAGES, INCLUDING ANY CLAIMS MADE BY ANY SUCCEEDING TENANT RESULTING FROM SUCH FAILURE TO VACATE, AND ANY CONSEQUENTIAL DAMAGES THAT LANDLORD SUFFERS FROM THE HOLDOVER.**

25. **Subordination to Mortgages; Estoppel Certificate**.  Tenant accepts this Lease subject and subordinate to any mortgage(s), deed(s) of trust, ground lease(s) or other lien(s) now or subsequently affecting the Premises, the Building or the Property, and to renewals, modifications, refinancings and extensions thereof (collectively, a "*Mortgage*").  The party having the benefit of a Mortgage shall be referred to as a "*Mortgagee*."  This clause shall be self-operative, but upon request from a Mortgagee, Tenant shall execute a commercially reasonable subordination agreement in favor of the Mortgagee.  In lieu of having the Mortgage be superior to this Lease, a Mortgagee shall have the right at any time to subordinate its Mortgage to this Lease.  If requested by a successor-in-interest to all or a part of Landlord's interest in this Lease, Tenant shall, without charge, attorn to the successor-in-interest.  Tenant shall, within 5 Business Days after receipt of a written request from Landlord, execute and deliver an estoppel certificate to those parties as are reasonably requested by Landlord (including a Mortgagee or prospective purchaser).  The estoppel certificate shall include a statement certifying that this Lease is unmodified (except as identified in the estoppel certificate) and in full force and effect, describing the dates to which Rent and other charges have been paid, representing that, to the best of Tenant's knowledge, there is no default (or stating with specificity the nature of the alleged default) and certifying other matters with respect to this Lease that may reasonably be requested.  Tenant's failure to provide any estoppel certificate within the 5 Business Day period specified above, and the continuation of such failure for a period of 5 Business Days after Landlord delivers a second written notice requesting same, shall constitute a Time Sensitive Default under this Lease.  In no event shall Tenant be required to execute and deliver estoppel certificates more than three (3) times in any twelve (12) month period.  Landlord shall use reasonable efforts, at Tenant's costs, to obtain Landlord's Mortgagee's then-current form of nondisturbance agreement for the benefit of Tenant.

26. **Attorneys' Fees**.  If either party institutes a suit against the other party for violation of or to enforce any covenant or condition of this Lease, or if either party intervenes in any suit in which the other party is a party to enforce or protect its interest or rights, the prevailing party shall be entitled to all of its costs and expenses, including reasonable attorneys' fees.  The term "*prevailing party*" is defined to mean the party who obtains a final unappealable determination of wrongful conduct by the other party regardless of whether actual damages are awarded.

27. **Notice**.  If a demand, request, approval, consent or notice (collectively, a "*notice*") shall or may be given to either party by the other, the notice shall be in writing and delivered by hand or sent by registered or certified mail with return receipt requested, or sent by overnight or same day courier service, at the party's respective Notice Address(es) set forth in **Article 1**, except that if Tenant has vacated the Premises (or if the Notice Address for Tenant is other than the Premises, and Tenant has vacated such address) without providing Landlord a new Notice Address, Landlord may serve notice in any manner described in this Article or in any other manner permitted by Law.  Each notice shall be deemed to have been received or given on the earlier to occur of actual delivery or the date on which delivery is first refused, or, if Tenant has vacated the Premises or the other Notice Address of Tenant without providing a new Notice

AMA000069

Address, three (3) days after notice is deposited in the U.S. mail or with a courier service in the manner described above. Either party may, at any time, change its Notice Address by giving the other party written notice of the new address in the manner described in this Article.

28. **Reserved Rights**. This Lease does not grant any rights to light or air over or about the Building. Landlord excepts and reserves exclusively to itself the use of: (A) roofs, (B) telephone, electrical and janitorial closets, (C) equipment rooms, Building risers or similar areas that are used by Landlord for the provision of Building services, (D) rights to the land and improvements below the floor of the Premises, (E) the improvements and air rights above the Premises, (F) the improvements and air rights outside the demising walls of the Premises, (G) the areas within the Premises used for the installation of utility lines and other installations serving occupants of the Building, and (H) any other areas designated from time to time by Landlord as service areas of the Building. Except as to the equipment identified on **Schedule A** attached hereto, the installation of which Landlord hereby approves, Tenant shall not have the right to install or operate any equipment producing radio frequencies, electrical or electromagnetic output or other signals, noise or emissions in or from the Building without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. To the extent permitted by applicable Law, Landlord reserves the right to restrict and control the use of such equipment. Landlord has the right to change the Building's name. Landlord also has the right to make such other changes to the Property and Building as Landlord deems appropriate, provided the changes do not materially affect Tenant's ability to use the Premises for the Permitted Use. Landlord shall also have the right (but not the obligation) to temporarily close the Building if Landlord reasonably determines that there is an imminent danger of significant damage to the Building or of personal injury to Landlord's employees or the occupants of the Building. The circumstances under which Landlord may temporarily close the Building shall include, without limitation, electrical interruptions, hurricanes and civil disturbances. A closure of the Building under such circumstances shall not constitute a constructive eviction nor entitle Tenant to an abatement or reduction of Rent.

29. **Surrender of Premises**. All improvements to the Premises (collectively, "*Leasehold Improvements*") shall be owned by Landlord and shall remain upon the Premises without compensation to Tenant. At the expiration or earlier termination of this Lease or Tenant's right of possession, Tenant shall remove Tenant's Removable Property (defined below) from the Premises, and quit and surrender the Premises to Landlord, broom clean, and in good order, condition and repair, ordinary wear and tear excepted. As used herein, the term "*Tenant's Removable Property*" shall mean: (A) Cable installed by or for the benefit of Tenant and located in the Premises or other portions of the Building; (B) any Leasehold Improvements that are installed by or for the benefit of Tenant and, in Landlord's reasonable judgment, are of a nature that would require removal and repair costs that are materially in excess of the removal and repair costs associated with typical Building improvements ("*Special Installations*"); and (C) Tenant's personal property. Notwithstanding the foregoing, Landlord may, in Landlord's sole discretion and at no cost to Landlord, require Tenant to leave any of its Special Installations in the Premises. If Tenant fails to remove any of Tenant's Removable Property (other than Special Installations which Landlord has designated to remain in the Premises) within 2 days after the termination of this Lease or of Tenant's right to possession, Landlord, at Tenant's sole cost and expense, shall be entitled (but not obligated) to remove and store Tenant's Removable Property.

AMA000070

Landlord shall not be responsible for the value, preservation or safekeeping of Tenant's Removable Property. Tenant shall pay Landlord, upon demand, the expenses and storage charges incurred for Tenant's Removable Property. To the fullest extent permitted by applicable Law, any unused portion of Tenant's Security Deposit may be applied to offset Landlord's costs set forth in the preceding sentence. In addition, if Tenant fails to remove Tenant's Removable Property from the Premises or storage, as the case may be, within 30 days after written notice, Landlord may deem all or any part of Tenant's Removable Property to be abandoned, and title to Tenant's Removable Property (except with respect to any Hazardous Material [defined in **Article 30**]) shall be deemed to be immediately vested in Landlord. Except for Special Installations designated by Landlord to remain in the Premises, Tenant's Removable Property shall be removed by Tenant before the Expiration Date; provided that upon Landlord's prior written consent (which must be requested by Tenant at least 30 days in advance of the Expiration Date and which shall not be unreasonably withheld), Tenant may remain in the Premises for up to 5 days after the Expiration Date for the sole purpose of removing Tenant's Removable Property. Tenant's possession of the Premises for such purpose shall be subject to all of the terms and conditions of this Lease, including the obligation to pay Base Rent and Additional Rent on a per diem basis at the rate in effect for the last month of the Term. In the event this Lease is terminated prior to the Expiration Date, Tenant's Removable Property (except for Special Installations designated by Landlord to remain in the Premises) shall be removed by Tenant on or before such earlier date of termination. Tenant shall repair damage caused by the installation or removal of Tenant's Removable Property.

30. **Hazardous Materials**.

       **A. Restrictions**. No Hazardous Material (defined below), except for (i) Bio-Hazardous Medical Wastes (defined below), and (ii) *de minimis* quantities of household cleaning products and office supplies, used in the ordinary course of Tenant's business at the Premises and used, kept and disposed of in compliance with all applicable Laws, shall be brought upon, used, kept or disposed of in or about the Premises or the Property by any Tenant Parties or any of Tenant's transferees, contractors or licensees without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion. Tenant's request for such consent shall include a representation and warranty by Tenant that the Hazardous Material in question (1) is necessary in the ordinary course of Tenant's business, and (2) shall be used, kept and disposed of in compliance with all Laws.

       **B. Remediation**. Tenant shall promptly notify Landlord if it suspects Contamination in the Premises. Any remediation of Contamination caused by a Tenant Party or its contractors or invitees which is required by Law or which is deemed necessary by Landlord, in Landlord's reasonable opinion, shall be performed by Landlord and Tenant shall reimburse Landlord for the cost thereof, plus a 10% administrative fee.

       **C. Definitions**. For purposes of this **Article 30**, a "*Hazardous Material*" is any substance the presence of which requires, or may hereafter require, notification, investigation or remediation under any Laws or which is now or hereafter defined, listed or regulated by any governmental authority as a "hazardous waste", "extremely hazardous waste", "solid waste", "toxic substance", "hazardous substance", "hazardous material" or "regulated

AMA000071

substance", or otherwise regulated under any Laws. "*Contamination*" means the existence or any release or disposal of a Hazardous Material or biological or organic contaminant, including any such contaminant which could adversely impact air quality, such as mold, fungi or other bacterial agents, in, on, under, at or from the Premises, the Building or the Property which may result in any liability, fine, use restriction, cost recovery lien, remediation requirement, or other government or private party action or imposition affecting any Landlord Party. For purposes of this Lease, claims arising from Contamination shall include diminution in value, restrictions on use, adverse impact on leasing space, and all costs of site investigation, remediation, removal and restoration work, including response costs under CERCLA and similar statutes.

   D. **Reports, Surveys and Acceptance of Premises**.  All current surveys or reports prepared for the Property regarding the presence of Hazardous Materials (if any) in the Building are available for inspection by Tenant in the office of the Property manager.  With respect to Hazardous Materials, Tenant hereby (1) accepts full responsibility for reviewing any such surveys and reports and satisfying itself prior to the execution of this Lease as to the acceptability of the Premises under **Section 3.B** above, and (2) acknowledges and agrees that this provision satisfies all notice requirements under applicable Law.  In the event Tenant performs or causes to be performed any test on or within the Premises for the purpose of determining the presence of a Hazardous Material, Tenant shall obtain Landlord's prior written consent and use a vendor approved by Landlord for such testing.  In addition, Tenant shall provide to Landlord a copy of such test within 10 days of Tenant's receipt.

31. **Miscellaneous**.

   A. **Governing Law; Jurisdiction and Venue; Severability; Paragraph Headings**. This Lease and the rights and obligations of the parties shall be interpreted, construed and enforced in accordance with the Laws of the state in which the Property is located.  All obligations under this Lease are performable in the county or other jurisdiction where the Property is located, which shall be venue for all legal actions.  If any term or provision of this Lease shall be invalid or unenforceable, then such term or provision shall be automatically reformed to the extent necessary to render such term or provision enforceable, without the necessity of execution of any amendment or new document.  The remainder of this Lease shall not be affected, and each remaining and reformed provision of this Lease shall be valid and enforced to the fullest extent permitted by Law.  The headings and titles to the Articles and Sections of this Lease are for convenience only and shall have no effect on the interpretation of any part of this Lease.  The words "include", "including" and similar words will not be construed restrictively to limit or exclude other items not listed.

   B. **Recording**.  Tenant shall not record this Lease or any memorandum without Landlord's prior written consent.

   C. **Force Majeure**.  Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant, the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist attacks (including bio-chemical

AMA000072

attacks), civil disturbances and other causes beyond the reasonable control of the performing party ("***Force Majeure***").  However, events of Force Majeure shall not extend any period of time for the payment of Rent or other sums payable by either party or any period of time for the written exercise of an option or right by either party.

     **D.**  **Transferability; Release of Landlord**.  Landlord shall have the right to transfer and assign, in whole or in part, all of its rights and obligations under this Lease and in the Building and/or Property, and upon such transfer where the transferee assumes all of Landlord's obligations under this Lease, Landlord shall be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations.

     **E.**  **Brokers**.  Tenant represents that it has dealt directly with and only with the Tenant's Broker (if any) identified in **Article 1** in connection with this Lease.  Landlord has agreed to pay the fees of the Tenant's Broker (if any) identified in **Article 1** to the extent that Landlord has agreed to do so pursuant to the terms and provisions of a commission agreement executed by and between Landlord and Tenant's Broker on or before the effective date hereof, which agreement (if any) is incorporated herein by reference for the specific purposes set forth in Section 62.022(b) of the Texas Property Code.  **TENANT AND LANDLORD SHALL EACH INDEMNIFY THE OTHER AGAINST ALL COSTS, EXPENSES, ATTORNEYS' FEES, LIENS AND OTHER LIABILITY FOR COMMISSIONS OR OTHER COMPENSATION CLAIMED BY ANY BROKER OR AGENT CLAIMING THE SAME BY, THROUGH OR UNDER THE INDEMNIFYING PARTY, OTHER THAN TENANT'S BROKER.**

     **F.**  **Authority; Joint and Several Liability**.  Landlord covenants, warrants and represents that each individual executing, attesting and/or delivering this Lease on behalf of Landlord is authorized to do so on behalf of Landlord, this Lease is binding upon and enforceable against Landlord, and Landlord is duly organized and legally existing in the state of its organization and is qualified to do business in the state in which the Premises are located.  Similarly, Tenant covenants, warrants and represents that each individual executing, attesting and/or delivering this Lease on behalf of Tenant is authorized to do so on behalf of Tenant, this Lease is binding upon and enforceable against Tenant; and Tenant is duly organized and legally existing in the state of its organization and is qualified to do business in the state in which the Premises are located.  If there is more than one Tenant, or if Tenant is comprised of more than one entity, the obligations imposed upon Tenant shall be joint and several obligations of all the entities.  Notices, payments and agreements given or made by, with or to any one person or entity shall be deemed to have been given or made by, with and to all of them.

     **G.**  **Time is of the Essence; Relationship; Successors and Assigns**.  Time is of the essence with respect to Tenant's performance of its obligations and the exercise of any expansion, renewal or extension rights or other options granted to Tenant.  This Lease shall create only the relationship of landlord and tenant between the parties, and not a partnership, joint venture or any other relationship.  This Lease and the covenants and conditions in this Lease shall inure only to the benefit of and be binding only upon Landlord and Tenant and their permitted successors and assigns.

---

AMA000073

**H. Survival of Obligations**.  The expiration of the Term, whether by lapse of time or otherwise, shall not relieve either party of any obligations which accrued prior to or which may continue to accrue after the expiration or early termination of this Lease.  Without limiting the scope of the prior sentence, it is agreed that Tenant's obligations under **Sections 4.A, 4.B,** and **4.C,** and under **Articles 6, 8, 12, 13, 19, 24, 29** and **30** shall survive the expiration or early termination of this Lease.

**I. Binding Effect**.  Landlord has delivered a copy of this Lease to Tenant for Tenant's review only, and the delivery of it does not constitute an offer to Tenant or an option.  This Lease shall not be effective against any party hereto until an original copy of this Lease has been signed by such party and delivered to the other party.

**J. Full Agreement; Amendments**.  This Lease contains the parties' entire agreement regarding the subject matter hereof.  All understandings, discussions, and agreements previously made between the parties, written or oral, are superseded by this Lease, and neither party is relying upon any warranty, statement or representation not contained in this Lease.  This Lease may be modified only by a written agreement signed by Landlord and Tenant.  Such amendment may be transmitted by e-mail, facsimile, or other method permitted by the provisions for giving notice in this Lease.  Furthermore, Tenant does not assent or agree to and will not be bound by any electronic signature or other electronic record, and without limiting the foregoing, Landlord and Tenant agree that the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act, including without limitation Chapter 322 of the Texas Business and Commerce Code, and any other laws applicable to contracting electronically do not and shall not apply to the execution of this Lease or any amendment hereto.  The exhibits and riders attached hereto are incorporated herein and made a part of this Lease for all purposes.

**K. Tax Waiver**.  Tenant waives all rights pursuant to all Laws to contest any taxes or other levies or protest appraised values or receive notice of reappraisal regarding the Property (including Landlord's personalty), irrespective of whether Landlord contests same.

**L. Method of Calculation**.  Tenant is knowledgeable and experienced in commercial transactions and does hereby acknowledge and agree that the provisions of this Lease for determining charges and amounts payable by Tenant are commercially reasonable and valid and constitute satisfactory methods for determining such charges and amounts as required by Section 93.012 of the Texas Property Code.  TENANT FURTHER VOLUNTARILY AND KNOWINGLY WAIVES (TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW) ALL RIGHTS AND BENEFITS OF TENANT UNDER SUCH SECTION, AS IT NOW EXISTS OR AS IT MAY BE HEREAFTER AMENDED OR SUCCEEDED.

**M. Waiver of Consumer Rights**.  TENANT HEREBY WAIVES ALL ITS RIGHTS UNDER THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, SECTION 17.41 ET SEQ. OF THE TEXAS BUSINESS AND COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.  AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY ADOPTS THIS WAIVER.

AMA000074

N. **OFAC List Representation**.  Tenant hereby represents and warrants to Landlord that neither Tenant nor any of its respective officers, directors, shareholders, partners, members or affiliates is or will be an entity or person: (i) that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order 13224 issued on September 24, 2001 ("*EO 13224*"); (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("*OFAC*") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http:www.treas.gov/ofac/t11sdn.pdf); (iii) who commits, threatens to commit or supports "terrorism," as that term is defined in EO 13224; or (iv) who is otherwise affiliated with any entity or person listed above.

O. **Façade Signage**.

(1)        During the Tenant's occupancy of the Premises, but only so long as (a) Tenant occupies at least 8,350 square feet of Square Footage in the Building and (b) no event of default has occurred under the Lease beyond any applicable cure period, Tenant shall have the right to install and maintain, at Tenant's sole expense, exterior signage identifying Tenant's trade name (the "*Façade Signage*") on the exterior façade of the Building in primary placement on the Building's existing façade sign, to the extent such exists.  The signage rights granted herein are personal to the specific party originally identified as the "Tenant" under the Lease and may not be transferred, shared or assigned in whole or in part to any assignee, subtenant or other tenant in the Building without Landlord prior written consent, which may be withheld in Landlord's sole discretion.

(2)        The location, size, material, construction and design (including the usage of Tenant's logo) of the Façade Signage shall be subject to (a) the prior written approval of Landlord, which may not be unreasonably withheld or delayed, and (b) compliance with applicable Laws.  Tenant shall not make any subsequent alterations in or additions to the Façade Signage without in each instance first complying with the foregoing requirements.  Tenant acknowledges that Landlord has made no representation that any Façade Signage proposed by Tenant will comply with applicable Law.  In  no event shall Tenant use a name on the Façade Signage that is in contravention of any prior signage rights.

(3)        Tenant, at its expense, shall obtain all necessary governmental permits and certificates required for the installation and use of the Façade Signage, as well as any approvals necessary under applicable Laws.  All construction, installation, alterations and repair and maintenance work shall be performed in a good and workmanlike manner in compliance with the Building's rules and regulations and shall not interfere with, delay or otherwise impose any additional expenses upon Landlord in the maintenance and operation of the Building or upon the use and enjoyment by other tenants of their respective premises in the Building.  Tenant shall maintain the Façade Signage and keep it in good working order repair and shall timely pay or cause to be paid all costs for work done by Tenant or caused to be done by Tenant related to the Façade Signage, in accordance with the provisions of **Section 9.C** of this Lease.

(4)        Upon the Expiration Date or earlier termination of Tenant's right to possess the Premises, or if Tenant otherwise fails at any time to comply with the requirements of this Section, Tenant shall, at its sole expense, promptly remove all such Façade Signage which

AMA000075

shall become the property of Tenant, and repair any damage caused by the Façade Signage or its removal.  However, if the Façade Signage is not removed from the Property within ten (10) Business Days after Landlord's notice, then the Façade Signage shall conclusively be deemed to have been abandoned by Tenant and may be removed, appropriated, sold, stored, destroyed or otherwise disposed of by Landlord without further notice to Tenant or any other person and without obligation to account therefor.  Tenant shall pay Landlord all expenses incurred in connection with any such removal, appropriation, sale, storage, destruction and disposition of the Façade Signage and the repair of any damage caused by the Façade Signage or its removal.

(5)    Notwithstanding anything to the contrary contained in this Section, or in any approvals or other communications, Landlord reserves the right, in its sole discretion and at its expense, to change any existing signage or modify its signage guidelines for the Property at any time and from time to time.

**P.   Bio-Hazardous Medical Waste.**   At Tenant's sole liability, risk, cost and expense, Tenant shall provide proper receptacles and containers for all Bio-Hazardous Medical Waste (hereinafter defined) and shall make such arrangements as shall be necessary, proper and/or required by applicable Law for the disposal of Tenant's Bio-Hazardous Medical Waste in strict compliance with all applicable Laws.  Tenant's arrangements for the disposal of Tenant's Bio-Hazardous Medical Waste are subject to the prior written approval of Landlord, which may not be unreasonably withheld or delayed.  Landlord assumes no duty, obligation or liability with respect to Tenant's Bio-Hazardous Medical Waste and Tenant agrees to indemnify Landlord from all liability arising out of the existence of Bio-Hazardous Medical Waste in or about the Premises and the creation, storage, transportation, and/or disposal thereof.  For the purposes of the Lease, the term "*Bio-Hazardous Medical Waste*" means any waste, substance or material (solid, liquid or gaseous), which is generated, produced or results from the diagnosis, treatment or immunization of human beings, or any research pertaining thereto, or the production or testing of biological agents.  The term "*Bio-Hazardous Medical Waste*" also includes any definition thereof or referenced thereto in any law, rule, regulation, order, or decree of any federal, state, or local government, including, without limitation, any substance defined or referred to 29 CFR Part 2910.1030.

**Q.   Exclusive Use.**   Subject to the remaining terms of this Section, Landlord will not enter into a lease, license or other occupancy agreement with any third party for space in the Building for the purpose of operating a freestanding emergency room clinic or urgent care clinic (the "*Prohibited Operations*").  This Section shall not apply to any existing leases or occupancy agreements in the Building.  Further, this Section shall not prohibit any Building tenant or other occupant from using its premises for purposes of providing medical care or related services, provided such tenant or occupant is not operating its premises for the Prohibited Operations.  Notwithstanding anything to the contrary set forth above, Tenant's rights and Landlord's obligations under this Section shall expire and be of no further force or effect following the earliest to occur of (i) a default by Tenant under this Lease beyond the expiration of any applicable grace or cure period, (ii) the expiration or earlier termination of this Lease or of Tenant's right to possess the Premises, or (iii) Tenant ceases using the Premises for the Permitted Use or the Permitted Use is hereafter changed upon mutual agreement of Landlord and Tenant.  The rights set forth in this Section are personal to the original tenant executing this Lease and

AMA000076

shall not inure to the benefit of any transferee of the Lease or of the Premises, notwithstanding anything to the contrary set forth elsewhere in this Lease.

  **R.  Building Use Restriction**.  For so long as Tenant continues to occupy at least 8,350 square feet in the Building, Landlord hereby agrees to limit the use of the Building, other than the Premises, to "Professional, personal service, and custom craft" office use only, as such use is defined in Section 51P-193.106(j) of Article 193 of the Dallas Development Code ("*PD 193*"), or such other use requiring equal or greater parking that may be permitted by the City of Dallas without affecting the parking rights of Tenant pursuant to Tenant's certificate of occupancy (the "*Building Use Restriction*"); provided, however, that the Building Use Restriction is expressly contingent upon binding written confirmation from the City of Dallas that, collectively with Tenant's Permitted Use for the Premises, if use of the remainder of the Building outside the Premises is limited by the Building Use Restriction, the Building has adequate parking without obligation to secure additional parking pursuant to PD 193.  Upon receipt of binding written confirmation from the City of Dallas that the Building has adequate parking as set forth above, Landlord will promptly provide its reasonable approval on any application, checklist or other document required by the City of Dallas or other governmental authority with jurisdiction over the Building for purposes of evidencing the Building Use Restriction as necessary for Tenant to obtain its Certificate of Occupancy for the Premises from the City of Dallas.  If Landlord unreasonably delays in providing its signature or approval pursuant to this paragraph for more than five (5) business days and such delay results in Tenant's failure to obtain its Certificate of Occupancy, then the Commencement Date shall automatically be extended day for day for each day of such unreasonable delay.  If Tenant is unable to obtain a building permit from the City of Dallas on or before twenty (20) days after the Effective Date, despite its commercially reasonable efforts to do so, Tenant shall have the option to terminate this Lease by giving written notice thereof to Landlord on or before the date that is thirty (30) days after the Effective Date.

[Remainder of page intentionally left blank]

AMA000077

Landlord and Tenant have executed this Lease as of the Effective Date specified below Landlord's signature.

**LANDLORD:**

ASSET MANAGEMENT ASSOCIATES, LLC. an Alaska limited liability company

By: _____
Name: _Herbert Lee_
Title: _MANAGING MEMBER_

Effective Date: ~~May_____, 2014~~ June 11, 2014

**TENANT:**

ASCENT REALTY, LLC. an Arkansas limited liability company

By: _____
Name: _____
Title: _____

AMA000078

# EXHIBIT A-1

## OUTLINE AND LOCATION OF PREMISES



AMA000079

## EXHIBIT A-2

## LEGAL DESCRIPTION OF PROPERTY

Being 33,600 square feet or 0.7713 acre tract of land situated in the William Grisgby Survey, Abstract No. 501, Dallas County, Texas, said tract being all of Lots 1, 2, and 3 and the Southeast 10 feet of Lot 4, Block 2/1562 of Hann and Kendall's Subdivision of Golf Grounds, an addition to the City of Dallas, Dallas County, Texas according to the map thereof recorded in Volume 1, Page 373, Map Records of Dallas County, Texas, said tract conveyed to Ronald P. Berlin by deed recorded in Volume 2001156, Page 9285, Deed Records of Dallas County, Texas and being more particularly described as follows:

BEGINNING at a found "x" cut on concrete pavement for a corner at the intersection of the Northeast line of Bowser Avenue (a 70 foot right of way) with the Northwest line of Oak Lawn Avenue (an 80 foot right of way), said point being the South corner of said Lot 1;

THENCE, N 45 degrees 00 minutes 00 seconds W, with the Northeast line of Bowser Avenue and the Southwest line of said Lots 1 through 4, a distance of 210.00 feet to a found "x" cut on concrete pavement for a corner;

THENCE, N 45 degrees 00 minutes 00 seconds E, ...

AMA000080

## EXHIBIT B

## RULES AND REGULATIONS

In the event of a conflict between the following Rules and Regulations and the terms of the Lease to which this Exhibit is attached, the terms of the Lease shall control.

1.      The sidewalk, entries, and driveways of the Property shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2.      Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Property.

3.      Except for service animals assisting the handicapped, no animals shall be allowed in the Premises or elsewhere on the Property.

4.      Tenant shall not disturb the occupants of the Property or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5.      If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted.  Any such installation or connection shall be made at Tenant's expense.

6.      Explosives or other articles deemed extra hazardous shall not be brought into the Property.  Notwithstanding the foregoing, Tenant shall be permitted to operate generators and other medically necessary equipment, subject to the terms of the Lease.

7.      Parking any type of recreational vehicles is specifically prohibited on or about the Property.  No vehicle of any type shall be stored in the parking areas at any time.  In the event that a vehicle is disabled, it shall be removed within 48 hours.  There shall be no "For Sale" or other advertising signs on or about any parked vehicle.  All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings.  All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord or otherwise set forth in a Tenant's Lease.

8.      Tenant shall use good faith efforts, including maintenance required by the Lease, to maintain the Premises free from rodents, insects and other pests.

9.      Landlord reserves the right to exclude or expel from the Property any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Property.

AMA000081

10.     Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness of the Premises, Building and/or Property.  Except for willful or gross negligent acts of Landlord Parties, Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11.     Tenant shall give Landlord prompt notice of any actually known defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12.     Tenant shall not permit storage outside the Premises or dumping of waste or refuse, or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13.     All movable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

14.     No auction, public or private, will be permitted on the Premises or the Property.

15.     No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16.     The Premises shall not be used for lodging, sleeping, or for any immoral or illegal purposes or for any purpose other than that specified in the Lease.  No gaming devices shall be operated in the Premises.

17.     Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Property and the Premises and the needs of other tenants, and shall not use more than such safe capacity.  Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18.     Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19.     Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

20.     Tenant shall not introduce, disturb or release asbestos or PCBs onto or from the Premises.

21.     Tenant shall at all times conduct its operations in a good and workmanlike manner, employing best management practices to minimize the threat of any violation of Environmental Requirements.

AMA000082

22.     Tenant shall not install any window shades, blinds or interior covering to windows without first obtaining Landlord's prior written consent.

23.     Tenant shall not, without the Landlord's prior written consent, place or maintain any merchandise or other articles in any vestibule, sidewalks, passages, courts, corridors, halls, elevators and stairways or entry of the Premises or elsewhere on the exterior thereof.

24.     Tenant shall not use or permit the use of any apparatus, or sound reproduction or transmission, or any musical instrument in such manner that the sound so reproduced, transmitted or produced shall be audible beyond the confines of the Premises, and will not use any other advertising medium, including without limitation flashing lights or search lights, which may be heard, seen, or otherwise experienced outside of the Premises other than normal canopy signs as approved by Landlord.

25.     Tenant shall keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the confines of the Premises.

26.     Tenant shall not cause or permit objectionable odors to emanate or be dispelled from the Premises.

27.     Tenant shall not solicit business handbills or other advertising matter or hold demonstrations in the parking areas or other Common Area.

28.     Tenant shall not permit the parking of delivery vehicles so as to interfere with the use of any driveway, walk, parking areas, or other Common Areas in the Property.

29.     Tenant shall refer to the name of the Property in all advertising done within the geographical area in which the Property is located.

30.     Tenant shall not use the plumbing facilities for any other purpose than that for which they are constructed and will not permit any foreign substance of any kind to be thrown therein, and the expense of repairing any breakage, stoppage, seepage or damage, whether occurring on or off the Premises, resulting from a violation of this provision by Tenant or Tenant's employees, agents or invitees shall be borne by Tenant. All grease traps and other plumbing traps shall be kept clean and operable by Tenant at Tenant's own cost and expense.

31.     Tenant shall not place or cause or permit to be placed within the Premises, pay telephones, vending machines or amusement devices of any kind without the prior written consent of Landlord.

## EXHIBIT C

## COMMENCEMENT LETTER

Re:     Lease dated May ___, 2014 (the "*Lease*") between ASSET MANAGEMENT ASSOCIATES, LLC ("*Landlord*") and ASCENT REALTY, LLC ("*Tenant*") for the Premises, the Square Footage of which is 8,350 square feet.  Unless otherwise specified, all capitalized terms used herein shall have the same meanings as in the Lease.

Landlord and Tenant agree that:

Landlord has fully completed all work that Landlord is required to perform under the terms of the Lease, if any.

Tenant has accepted possession of the Premises.  The Premises are usable by Tenant as intended; Landlord has no obligation to perform any work or other construction, and Tenant acknowledges that both the Building and the Premises are satisfactory in all respects.

The Commencement Date of the Lease is _____, 2014.

The Expiration Date of the Lease is the last day of _____, _____.

Tenant's Address at the Premises after the Commencement Date is:

        _____

        _____

        _____

        Attention:_____

        Phone:_____

All other terms and conditions of the Lease are ratified and acknowledged to be unchanged.

        EXECUTED as of _____, 2014.

                        {ATTACH APPROPRIATE SIGNATURES}

AMA000084

## EXHIBIT D

## WORK LETTER

1.  **Construction**.  Tenant agrees to construct leasehold improvements (the "***Tenant Work***") in a good and workmanlike manner in and upon the Premises, at Tenant's sole cost and expense, subject to **Paragraph 2** below, in accordance with the following provisions.  Tenant shall submit to Landlord for Landlord's approval (which approval shall not be unreasonably withheld, conditioned or delayed) complete plans and specifications for the construction of the Tenant Work ("***Tenant's Plans***").  Tenant's Plans shall include Tenant's obligation to (i) remove the existing internal stair case within the Premises, (ii) replace all resulting necessary structural support between the first floor and second floor of the Building to the satisfaction of Landlord or Landlord's engineer, and (iii) replace the ceiling on the first floor and the floor on the second floor such that the first floor and second floor are each fully demised from each other.  Within 15 Business Days after receipt of Tenant's Plans, Landlord shall review and either approve or disapprove Tenant's Plans; Landlord's failure to timely notify Tenant of Landlord's approval or disapproval shall be deemed to be approval.  If Landlord disapproves Tenant's Plans, or any portion thereof, Landlord shall notify Tenant thereof within such 15 Business Day period, and of the revisions Landlord requires before Landlord will approve Tenant's Plans.  Within 15 Business Days after Landlord's notice disapproving Tenant's Plans, Tenant shall submit to Landlord, for Landlord's review and approval (which approval shall not be unreasonably withheld, conditioned or delayed), plans and specifications incorporating the required revisions. The final plans and specifications approved by Landlord are hereinafter referred to as the "***Approved Construction Documents***".  Tenant will employ experienced, licensed contractors, architects, engineers and other consultants, as set forth on Landlord's then-current approved contractor list (or as otherwise approved by Landlord), to construct the Tenant Work and will require in the applicable contracts that such parties (a) carry insurance in such amounts and types of coverages as are reasonably required by Landlord, and (b) design and construct the Tenant Work in a good and workmanlike manner and in compliance with all Laws.  Unless otherwise agreed to in writing by Landlord and Tenant, all work involved in the construction and installation of the Tenant Work shall be carried out by Tenant's contractor under the sole direction of Tenant, in compliance with all Building rules and regulations and in such a manner so as not to unreasonably interfere with or disturb the operations, business, use and enjoyment of the Property by other tenants in the Building or the structural calculations for imposed loads. Tenant shall obtain from its contractors and provide to Landlord a list of all subcontractors providing labor or materials in connection with any portion of the Tenant Work prior to commencement of the Tenant Work.  Tenant warrants that the design, construction and installation of the Tenant Work shall conform to the requirements of all applicable Laws, including building, plumbing and electrical codes and the requirements of any authority having jurisdiction over, or with respect to, such Tenant Work.

2.  **Costs**.  Subject to the terms and conditions of this **Paragraph 2**, Landlord will provide Tenant with an allowance (the "***Reimbursement Allowance***") to be applied towards the cost of constructing the Tenant Work.

AMA000085

(A)  Landlord's obligation to reimburse Tenant for Tenant's construction of the Tenant Work shall be: (i) limited to actual costs incurred by Tenant in its construction of the Tenant Work; (ii) limited to an amount up to, but not exceeding, $30.00 multiplied by the Square Footage of the Premises; and (iii) conditioned upon Landlord's receipt of written notice (which notice shall be accompanied by invoices and documentation set forth below) from Tenant that the Tenant Work has been completed and accepted by Tenant.  The cost of (a) all space planning, design, consulting or review services and construction drawings, (b) materials and labor, (c) any permits and/or inspections required in connection with, or as a prerequisite to, the construction and/or completion of the Tenant Work, shall all be included in the cost of the Tenant Work and may be paid out of the Reimbursement Allowance, to the extent sufficient funds are available for such purpose.  Any reimbursement obligation of Landlord under this Work Letter shall be applied solely to the purposes specified above, as allocated, within twelve (12) months after the Effective Date or be forfeited with no further obligation on the part of Landlord.

(B)  Landlord shall pay the Reimbursement Allowance to Tenant within thirty-one (31) days following Landlord's receipt of (i) third-party invoices for costs incurred by Tenant in constructing the Tenant Work; (ii) evidence that Tenant has paid the invoices for such costs; and (iii) lien waivers from any contractor or supplier who has constructed or supplied materials for the Tenant Work.  If the costs incurred by Tenant in constructing the Tenant Work exceed the Reimbursement Allowance, then Tenant shall pay all such excess costs and Tenant agrees to keep the Premises and the Property free from any liens arising out of the non-payment of such costs.

(C)  All installations and improvements now or hereafter placed in the Premises or elsewhere on the Property other than building standard improvements shall be for Tenant's account and at Tenant's cost.  Tenant shall pay ad valorem taxes and increased insurance thereon or attributable thereto, which cost shall be payable by Tenant to Landlord as additional Rent within 30 days after receipt of an invoice therefor.  Tenant's failure to pay such cost within 30 days after receipt of such invoice shall constitute an event of default under the Lease.

Prior to commencing construction, Tenant shall provide such documentation to Landlord as Landlord may reasonably require to evidence that Tenant has sufficient funds available in a segregated account for the purpose of paying any costs of the Tenant Work in excess of the Reimbursement Allowance.

**3.  Electrical Design Capacity**.  Any requirements, services or equipment shall not exceed the existing electrical design capacity of the Building without obtaining the prior written approval of Landlord, and provided further that Tenant complies with all applicable Laws and provisions of the Lease.  The cost of purchasing and installing any approved additional electrical equipment in excess of the capacity currently available at the Premises shall be paid at Tenant's expense.

**4.  ADA Compliance**.  Tenant shall, at its expense, be responsible for ADA compliance in the Premises, including restrooms on any floor now or hereafter leased or occupied in its entirety by Tenant, its Affiliates or transferees.  Landlord shall not be responsible for determining whether Tenant is a public accommodation under ADA or whether the Approved Construction Documents comply with ADA requirements.  Such determinations, if desired by

AMA000086

Tenant, shall be the sole responsibility of Tenant. Landlord's approval of the Approved Construction Documents shall not be deemed a statement of compliance with applicable Laws, nor of the accuracy, adequacy, appropriateness, functionality or quality of the improvements to be made according to the Approved Construction Documents.

**5.    Landlord's Oversight and Coordination**. Construction of the Tenant Work shall be subject to oversight and coordination by Landlord or Landlord's construction manager, but such oversight and coordination shall not subject Landlord to any liability to Tenant, Tenant's contractors or any other person. Landlord or Landlord's construction manager has the right to inspect construction of the Tenant Work from time to time. Tenant shall pay Landlord or Landlord's construction manager a fee equal to 5% of the Reimbursement Allowance (***"Landlord's Oversight Fee"***) in connection with such oversight and coordination, which fee may be paid out of the Reimbursement Allowance.

**6.    Assumption of Risk and Waiver**. Tenant hereby assumes any and all risks involved with respect to the Tenant Work and hereby releases and discharges all Landlord Parties from any and all liability or loss, damage or injury suffered or incurred by Tenant or third parties in any way arising out of or in connection with the Tenant Work. Tenant's failure to complete Tenant's Work prior to the Commencement Date shall not entitle Tenant to postpone its obligations under the Lease, including the obligation to pay Rent commencing on the Commencement Date.

**7.    Building Work.** Tenant acknowledges that Landlord will be conducting additional work in the Building (the "***Building Work***") related to demising the first floor of the building from the second floor (in additional to Tenant's obligations set forth in **Paragraph 1** above) prior to the Commencement Date while Tenant is in possession of the Premises, and agrees that Landlord, its agents, employees and contractors shall have the right to enter the Premises during business hours to conduct the Building Work; provided that Landlord shall use commercially reasonable efforts while in the Premises to not interfere with or delay the Tenant Work. If, despite commercially reasonable efforts to the contrary, Landlord interferes with or delays the Tenant Work in connection with the Building Work, then the Commencement Date shall be extended day for day for each day of delay caused by such interference. Tenant understands that the Building Work to be performed pursuant to this **Paragraph 7** may result in noise, vibration, dirt, dust, odors, and other circumstances commonly attendant to construction. Tenant hereby waives any claim of injury, interference or inconvenience to the Tenant Work, or loss of occupancy or quiet enjoyment of the Premises, or any other loss occasioned by such entry or the performance of the Building Work pursuant to the terms of this **Paragraph 7**, and the same shall not relieve Tenant of any obligations under the Lease. No entry into the Premises by Landlord under this Work Letter shall be deemed a forcible or unlawful entry into the Premises or a detainer of the Premises, or an eviction, actual or constructive, of Tenant from the Premises, or any part of the Premises, nor shall such entry entitle Tenant to damages or an abatement of Rent or other charges that the Lease requires Tenant to pay. Tenant shall fully cooperate with Landlord and its contractors and shall not in any way impede, inhibit or hinder any of the Building Work.

AMA000087

# RIDER NO. 1

## OPTION TO EXTEND

**A.      Renewal Period.**  Tenant may, at its option, extend the Term for two (2) renewal periods of five (5) years each (each, a "*Renewal Period*") by written notice to Landlord (the "*Renewal Notice*") given no earlier than twelve (12) nor later than nine (9) months prior to the expiration of the Term (or the prior Renewal Period, as applicable), provided that at the time of such notice and at the commencement of such Renewal Period, (i) Tenant remains in occupancy of the Premises, and (ii) no uncured event of default exists under the Lease.  The Base Rent payable during the first Renewal Period shall be at a rate of $46.00 per Rentable Square Footage of the Premises.  The Base Rent payable during the second Renewal Period shall be at the then-current rental rates for similar space in similar building types within the same submarket.  Except as provided in this **Rider No. 1**, all terms and conditions of the Lease shall continue to apply during the Renewal Period, except that Tenant shall have no further option to extend the Term of the Lease after Tenant's exercise of its second renewal option.

**B.      Acceptance.**  Within 30 days of the Renewal Notice, Landlord shall notify Tenant of the Base Rent for such Renewal Period (the "*Rental Notice*").  Tenant may accept the terms set forth in the Rental Notice by written notice (the "*Acceptance Notice*") to Landlord given within 15 days after receipt of the Rental Notice.  If Tenant timely delivers its Acceptance Notice, Tenant shall, within 15 days after receipt from Landlord, execute a lease amendment confirming the Base Rent and other terms applicable during the Renewal Period.  If Tenant fails timely (i) to deliver its Acceptance Notice or (ii) to execute and return the required lease amendment, then Tenant's rights under this Rider shall automatically expire and be of no further force or effect.  The rights set forth in this Rider are personal to the original tenant executing the Lease and shall not inure to the benefit of any transferee of the Lease or of the Premises, notwithstanding anything to the contrary set forth elsewhere in the Lease.

**C.      Redevelopment.**  Notwithstanding the foregoing or anything to the contrary contained in this Lease, Landlord may void the second Renewal Period and/or terminate this Lease at any time after the expiration of the first Renewal Period by delivering written notice to Tenant (the "*Termination Notice*") 180 days prior to such termination stating that Landlord intends to redevelop the Property.  Within 180 days of the date of the Termination Notice, Tenant shall surrender possession of the Premises in accordance with **Section 29** of this Lease, after which neither party shall have any further obligation unto the other except as expressly survives the termination or expiration of this Lease.

AMA000088

## GUARANTY OF LEASE

1.      **Guaranty.**  To induce ASSET MANAGEMENT ASSOCIATES, LLC, an Alaska limited liability company ("*Landlord*"), to enter into a Lease (the "*Lease*") for space at 3607 Oak Lawn Avenue, Dallas, Texas  75219, with ASCENT REALTY, LLC, an Arkansas limited liability company ("*Tenant*"), each undersigned "*Guarantor*" executes and delivers this Guaranty of Lease (the "*Guaranty*") pursuant to which Guarantor absolutely, unconditionally and irrevocably guarantees to Landlord (a) payment to Landlord when due of (i) all Base Rent, Tenant's Pro Rata Share of CAM Costs, Tax Expenses and Insurance Expenses, and other Rent; (ii) all amounts payable by reason of any indemnity, breach of warranty or event of default by Tenant under the Lease; and (iii) all costs incurred by Landlord in enforcing its rights and remedies under the Lease and/or this Guaranty, including reasonable attorneys' fees, court costs and investigation expenses; and (b) performance of all of Tenant's other obligations under the Lease (collectively, "*Guaranteed Obligations*"); provided that each Guarantor's individual liability shall not exceed Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00) (each Guarantor's "*Maximum Liability*").  This is a continuing guaranty of payment and not of collection and Guarantor's liability is primary and not secondary.  Landlord may, at its option, proceed against Guarantor without first commencing an action or obtaining a judgment against Tenant or any other party.  Unless otherwise expressly provided in this Guaranty, all capitalized terms shall have the same meanings as in the Lease.

2.      **Waivers and Releases.**

        a.      Guarantor waives marshaling of assets and liabilities, sale in inverse order of alienation, presentment, demand for payment, protest, notice of acceptance of this Guaranty, notice of nonpayment, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices, demands, suits or other actions otherwise required as a condition to Landlord's exercise of its rights under the Lease or this Guaranty.  Guarantor's liability hereunder shall not be released by Landlord's receipt, application or release of security given for performance of any such obligations, nor shall Guarantor be released by reason of any lien held or executed upon Tenant and/or its assets by any Landlord Party.

        b.      This Guaranty shall in no way be affected by (i) any extension of time for payment or performance of any Guaranteed Obligations; (ii) supplementation or amendment (material or otherwise) of the Lease, or renewal or extension thereof, or increase in the size of the Premises (whether within the Building or the Property); (iii) any failure, omission, delay or lack of diligence by Landlord or any other person or entity, to enforce, assert or exercise any right or remedy of Landlord under the Lease or this Guaranty; (iv) settlement or compromise of any Guaranteed Obligation; (v) release or discharge of Tenant in any creditor's receivership, bankruptcy or other proceedings; (vi) impairment, limitation or modification of the liability of Tenant (or its estate in bankruptcy), or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code or other statute or from the decision of any court; (vii) rejection or disaffirmance of the Lease in any such proceedings; (viii) assignment, sublease or other transfer

AMA000089

of the Lease or the Premises, or any interest therein, by Landlord or Tenant; (ix) any disability or other defense of Tenant; or (x) cessation of Tenant's liability for any cause whatsoever.

c.      Until all Guaranteed Obligations are fully performed, Guarantor (i) has no right of subrogation against Tenant due to any payment or performance by Guarantor; (ii) waives any right to enforce any remedy Guarantor may now or hereafter have against Tenant due to any such payment or performance; and (iii) subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the Guaranteed Obligations in favor of Landlord.

**3.      Representations and Warranties.**  Guarantor represents and warrants, as a material inducement to Landlord to enter into the Lease, that (a) this Guaranty and each instrument securing this Guaranty have been duly executed and delivered and constitute legally enforceable obligations of Guarantor; (b) there is no action, suit or proceeding pending or, to Guarantor's knowledge, threatened against or affecting Guarantor, at law or in equity, or before or by any governmental authority, which might result in any materially adverse change in Guarantor's business or financial condition; (c) as of the date hereof, Guarantor's financial condition is adequate to secure Guarantor's obligations under this Guaranty; (d) execution of this Guaranty shall not render Guarantor insolvent; (e) from and after the date hereof, Guarantor shall not take any action, such as assuming additional liabilities, divesting assets or otherwise, which would impair Guarantor's ability to perform its obligations under this Guaranty; and (f) Guarantor has a bona fide interest in Tenant's financial success.

**4.      Notice.**  Any notice or communication hereunder shall be given in writing by, and deemed received upon, posting in a U.S. Postal Service receptacle, postage prepaid, registered or certified mail, return receipt requested, or by expedited courier, where proof of delivery can be shown, to Landlord as specified in the Lease, and to each Guarantor at the address(es) provided below.

**5.      Substitution of Guarantor.**  If any Guarantor sells or otherwise transfers (the "***Transferring Guarantor***") its interest in Tenant to another Guarantor or any other party (the "***Replacement Guarantor***") then the Transferring Guarantor shall be released from any obligations under this Guaranty that arise from and after the date of such transfer so long as the Replacement Guarantor agrees to be bound by the terms of this Guaranty and any obligations hereunder arising from and after the date of such transfer.

**5.      Interpretation.**  This Guaranty shall be governed by and construed in accordance with applicable Law.  The proper place of venue to enforce payment or performance under this Guaranty shall be the county or other jurisdiction in which the Premises are located.  The representations, covenants and agreements set forth herein shall continue and survive the termination of the Lease and/or this Guaranty.  The masculine and neuter genders each include the masculine, feminine and neuter genders.  This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and Landlord.  The word "Guarantor" shall apply to each individual identified below, each of whom shall be jointly and severally liable hereunder; subject to the Maximum Liability of each Guarantor as set forth above.  The words "Guaranty" and "guarantees" shall not be interpreted to limit Guarantor's primary obligations and liability hereunder.

AMA000090

**6.     Consent to Jurisdiction.**  In any legal proceeding regarding this Guaranty, including enforcement of any judgments, Guarantor irrevocably and unconditionally (a) submits to the jurisdiction of the courts of law in the county or district in which the Property is located; (b) accepts the venue of such courts and waives and agrees not to plead any objection thereto; and (c) agrees that (i) service of process may be effected at the address specified in Paragraph 4 above, or at such other address of which Landlord has been properly notified, and (ii) nothing herein shall affect Landlord's right to effect service of process in any other manner permitted by Law.

**7.     Successors and Assigns.**  This Guaranty shall inure to the benefit of Landlord and its successors and assigns, and shall be binding upon Guarantor and its executors, administrators, heirs, successors and assigns.  Guarantor shall not assign any obligation hereunder without Landlord's prior written consent.  If any Guarantor who is a living person dies while this Guaranty is in force, then such deceased Guarantor's heirs, executors, administrators and representatives shall not make any distribution or disposition of assets from the estate without first making provisions acceptable to Landlord for the satisfaction of such deceased Guarantor's obligations (and contingent obligations) hereunder.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

AMA000091

IN WITNESS WHEREOF, Guarantor executes this Guaranty as of _____ June 11 _____, 2014.

**GUARANTORS:**

_____
Cole Peck, M.D.
1001 CR 759
Jonesboro, AR  72401

_____
Ja Lynn Kuo, M.D.
2014 W Colonial
Orlando, FL  32804

_____
Karen Kuo, M.D.
1001 CR 759
Jonesboro, AR  72401

_____
Subho Mullick, M.D.
225 S. Main, Apt. 204
Jonesboro, AR  72401

_____
James Fletcher, III
2905 Abernathy
Jonesboro, AR  72404

_____
Salima Thobani
6945 Alta Vista
Rancho Palos Verdes, CA  90275

_____
Gary Mark Wilson
4001 S 27th St

AMA000092

Greg McGaw
6750 W. Loop S., Suite 950
Bellaire, TX 77401


David Shoulders
17400 N. Dallas Pkwy, Suite 100
Dallas, Texas 75287

AMA000093

Greg McGaw
6750 W. Loop S., Suite 950
Bellaire, TX 77401

David Shoulders
17400 N. Dallas Pkwy, Suite 100
Dallas, Texas 75287

AMA000094